In re Dan Cecil MOORE, Jr., a/k/a Dan C. Moore, a/k/a Dan Moore f/d/b/a Dan Moore and Associates; formerly a partner in Russell, Sheet & Moore, Debtor.

William F. LAWLESS, Trustee, Plaintiff,

v.

Robert ANDERSON, Defendant.

Bankruptcy No. 82–616–Orl–BK–GP. Adv. No. 83–379.

United States Bankruptcy Court, M.D. Florida, Orlando Division.

May 14, 1984.

Michael G. Williamson and Frank M. Wolff, Orlando, Fla., for plaintiff.

Kenneth W. McIntosh and Clayton D. Simmons, Sanford, Fla., for defendant.

William F. Lawless, Maitland, Fla., trustee.

## MEMORANDUM OPINION

GEORGE L. PROCTOR, Bankruptcy Judge.

This action was brought by the Chapter 7 trustee to avoid a fraudulent transfer under § 548 of the Bankruptcy Code. We are presented with a threshold question of whether the deposition evidence offered by the debtor and the defendant may be considered. The defendant argues that those depositions, which form virtually the entire body of evidence before the Court in that minimal testimony was taken at trial, may not be considered. The defendant declares that if we are barred from considering that evidence then we must determine that the plaintiff has failed to carry his burden and enter judgment in the defendant's favor.

With respect to the deposition of the defendant, F.R.Civ.Pro. 32(a)(2) provides that, "the deposition of a party ... may be used by an adverse party for any purpose," including, it seems clear, evidence in chief. The language of Rule 32(a)(2) is explicit and not limited by any other provision.

■ The defendant argues that the depositions of the debtor, taken while he was (as he continues to be) an inmate at the Lake Correctional Institution, may not be used pursuant to F.R.Civ.Pro. 32(a)(3), which provides in pertinent part for use at trial of a deposition when "(C) that witness is unable to attend or testify because of ... imprisonment." The defendant argues that in addition to showing the undisputed fact of the witness' imprisonment at the time of the trial, the defendant must show unavailability on account of imprisonment, i.e. that he tried and failed to produce the witness through use of a habeas corpus proceeding authorized by 28 U.S.C. § 2256. We find this argument frivolous. There is some theoretical means by which virtually any living witness, however restricted in movement, might, with sufficient effort and expense, attend a trial. There is no basis for a belief that the rule requires extraordinary effort to establish unavailability. Thus the debtor's deposition testimony, as well as that of the defendant, will be considered.

■ That testimony establishes that while Dan Cecil Moore was viewed in his community as a successful individual, and had in fact apparently prospered as an insurance salesman, his fortunes had suffered a downturn during the months prior to his becoming involved in the fraudulent scheme which led to his imprisonment and bankruptcy. The financial planning business into which he had entered with two partners had failed. Whether because of the terms of his agreement with those partners or their default, Moore was left with personal responsibility for most or all of the debts of the failed business. While he and his wife apparently had a substantial combined income, he had no savings, had exhausted his available credit, and did not want his wife to know that he was in financial difficulty. He was equally reticent about revealing his problem to friends and associates. When his efforts to obtain loans from out-of-town friends and relations failed, he embarked on a pattern of offering an "investment opportunity" to close friends. He told them that the insurance company with which he was associated as a general agent permitted its agents to invest funds for 10% monthly return. No such opportunity in fact existed, but Moore nonetheless took in substantial funds as investments and quickly began paying interest out of current receipts. From the beginning of the scheme, his indebtedness was always the full amount he

had taken in (he told at least some of the investors that their principal would be returned on demand), plus 120% annual interest. Clearly, he was at all times from the point at which he began accepting money in November 1979, to the time he filed for bankruptcy, insolvent, and equally "intended to incur, or believed (he) would incur, debts that would be beyond (his) ability to pay as such debts matured."

Word of the "opportunity" offered by Mr. Moore spread within his community and the amount entrusted to him ultimately rose to approximately one-half million dollars. His conduct amounted to the perpetration of a classic "Ponzi" scheme, which ended with his filing a Chapter 7 petition on June 23, 1982. We find that the defendant became a "client" in early 1980, and was thus one of the earlier investors; he made an initial investment of $20,000, made on April 22, 1982. By the end of that year, he had received $18,000 in "interest," actually the money of later investors, by the end of the year. On December 17, 1980, he invested a second $20,000. In all, the defendant invested $40,000 and received $62,-200, including the return of his capital, which he demanded when he began to question the soundness of the debtor's operation. He received $27,200 during the year prior to the filing of the debtor's petition; of that $22,200 is in excess of his investment. The trustee urges that the transfer of that $22,200 meets all of the criteria for fraudulent transfer.

We find no cases decided under the Bankruptcy Code on closely analogous facts. Cases decided under the Bankruptcy Act include *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), which case grew out of the original "Ponzi" scheme, and *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir.1980).

While *Cunningham* was brought and decided under the preference section of the Act § 60, the precursor to § 547 of the Code, *Rosenberg* was decided under § 67(d) of the Act, the fraudulent transfer provision, which is, for purposes of the case before us, substantially similar to § 547 of the Code.

*Rosenberg* appears to have been decided on the basis of facts and arguments similar to those before us and holds for the Trustee. For reasons discussed *infra*, we believe it appropriate to treat *Rosenberg* as controlling.

The defendant does not contest that the facts of this case fulfill the elements of fraudulent transfer, except in respect of the debtor having received reasonably equivalent value, which takes a transaction out of the fraudulent transfer category under the terms of § 548(a)(2)(A). He also argues that there is an additional factor at work which makes funds held by the defendant non-recoverable to the trustee, i.e. that because the funds were garnered by the debtor as a result of a fraudulent scheme they remain the property not of the estate but of the defrauded individuals.

With respect to the equivalent value argument, we do not deem the concept applicable to a "Ponzi" scheme. The defendant, we presume unwittingly, paid for the privilege of receiving funds of others, in excess of his own investment, on the basis of the debtor's fraud. We would be hard pressed to determine what would constitute reasonably equivalent value in such an exchange; without some persuasive authority we cannot find it in this instance.

As to the position that the "profit" held by the defendant is not part of the estate, the rule that the defendant urges on the Court, to be extrapolated from two cases he cites, appears to be as follows: a) the Trustee has no rights against the rightful owner who was a victim of the debtor's fraud, and b) a victim of fraud may exercise the equitable remedy of rescission and recover the fraudulently obtained property directly from the trustee without being required to follow the usual claim procedure. *Nicklaus v. Bank of Russellville*, 336 F.2d 144 (8th Cir.1964); *In re Paragon Securities Co.*, 589 F.2d 1240 (3d Cir.1978). *Paragon* points out in a footnote that most cases in which the rescission remedy has been permitted as against the trustee in-

volve actions by the seller to recover goods sold to the debtor under a contract induced by fraud. While there may be some basis for application of such a rule to sellers of goods, it appears highly impractical as applied to funds which are not traceable; indeed presuming a number of similarly situated individuals all wishing to rescind, the usual outcome would be to reward the swift to the courthouse and effect a highly inequitable distribution. In any event, we must find that the defendant's argument is invalid under the Code and that if it had some validity he would nonetheless lack standing to assert it.

The Code defines a "Claim," as inclusive of

> right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. 11 U.S.C. § 101(4)(B)

The broad definition of the estate of the debtor in § 541 does not exclude, expressly or impliedly, goods wrongfully acquired by the debtor, nor make any provision supporting the argument that a fraud victim occupies a position different from that of any other claimant.

In *Rosenberg, supra,* the defendant raised the analytically rather similar argument that the actions of the debtor had led to the creation of a constructive trust in favor of the defrauded individuals, thus causing any money which had been paid by the debtor, in that case a bogus commodities broker, to be removed from the estate. The *Rosenberg* Court found that in order for such a trust to exist it would have to have been created pursuant to state law and that no state law supported its existence. We know of no provision of Florida law which calls for ownership interest in the funds distributed by the debtor vesting in anyone except the trustee.

Strong implicit support of the proposition that a fraud victim essentially occupies a position no different than that of any other unsecured creditor (unless and until he chooses to bring an adversary action for exception to the discharge) is found in the provisions of § 523(a)(2)(A) and (a)(4), which provide for non-dischargeability of debts incurred by fraud, as specifically described in those sections. Section § 523 tells us that a creditor who alleges that the debt incurred to him was induced by means of fraud has the (exclusive) remedy of seeking a judgment of non-dischargeability; such a victim is nowhere extended the option of treating the property as not part of the estate. (This Court explicitly adopts for purposes of this bankruptcy the *Rosenberg* rule that the losing investors are general unsecured creditors to the extent of their losses.)

In any event, as we intimated above, the remedies which the defendant urges on us would not be of any benefit to him. Even if we were to adopt the position that the money held by the defendant, in excess of his original investment, was not recoverable by the trustee, we certainly could not seriously entertain the idea that the defendant has any better right to it. If the money does not belong to the trustee, it must belong to those who would at this point have been its rightful owners had bankruptcy not intervened, i.e. to those investors from whose funds the defendant's "profits" derived. The defendant, as far as we can discern, is not claiming to hold the funds for the benefit of those who received less than they paid in; we must presume that he wants to keep them. As matters now stand, he is a beneficiary rather than a victim of the debtor's fraudulent course of conduct. Following compliance with the judgment which this Court will enter in accordance with this opinion, he will be no worse off than he was before he entrusted funds to the debtor, in that it is undisputed that he recovered all of the funds that he invested prior to the debtor's filing for bankruptcy, and the trustee's complaint seeks only funds received by him in excess of that investment. It is the ultimate goal of bankruptcy law to treat similarly situated persons fairly and equally. The defend-

ant in this case was more zealous in shepherding his "investment" than were some of the others who were lured by the prospect of a deal too good to be true. Equity does not permit his zeal to be rewarded.

It appearing that the trustee has established the elements of fraudulent transfer, and it further appearing that equitable principles require recovery by the trustee, we find that the trustee is entitled to a judgment of $22,200, plus interest and his costs in prosecuting this action.

A final judgment in accordance with this opinion has been separately entered this date.