In re WESTERN WORLD
FUNDING, INC., Debtor.

In re LEASCO FINANCIAL
CORPORATION, Debtor.

In re UNITED SECURITY
SYSTEMS, INC., Debtor.

In re UNITED EMERGENCY
SERVICES, INC., Debtor.

In re UNITED SECURITY SYSTEMS
LEASING, INC., Debtor.

Timothy J. HENDERSON,
Trustee, Plaintiff,

v.

Lee M. ALLRED, et al., Defendants.

Bankruptcy Nos. 82–477, 82–508, 82–517,
82–507 and 82–478.
Adv. No. 84–44.

United States Bankruptcy Court,
D. Nevada.

Oct. 29, 1985.

472

Edward Bernard, Carson City, Nev., Terrill R. Dory, Reno, Nev., Paul W. Freitag,

Sparks, Nev., H. Rodlin Goff, Reno, Nev., Rebecca A. Harold, Fernley, Nev., Charles M. Kilpatrick, Carson City, Nev., William M. O'Mara, Frank W. Thompson, F. Harvey Whittemore, Reno, Nev., for defendants.

Lee S. Molof, Reno, Nev., for plaintiff.

## MEMORANDUM DECISION

ROBERT CLIVE JONES, Bankruptcy Judge.

This adversary proceeding was commenced on April 2, 1984 with the filing of a Complaint whereby the Trustee sought to avoid preferential transfers of over $800,-000 made to several hundred "investors" in Western World Funding (WWF) and United Security Systems Leasing (USSL). These debtors filed for protection under Chapter 11 of the Bankruptcy Code[1] on June 16, 1982, and were soon followed by the other above-named corporations. Timothy Henderson was appointed trustee by Order of this Court dated July 6, 1982, and his motion for joint administration was granted two days later. Finally, on April 5, 1983, these cases were converted for liquidation under Chapter 7 and substantively consolidated.

Having conducted a trial of this case on December 5, 1984, and having duly considered the record, the Court hereby makes its Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052. The Findings of Fact made herein may be considered Conclusions of Law to the extent appropriate. The Conclusions of Law made herein may be considered Findings of Fact to the extent appropriate.

## FINDINGS OF FACT

1. Debtors Western World Funding, Inc. and/or United Security Systems Leasing, Inc., transferred property of these debtors to or for the benefit of the below-named Defendants in the below-named amounts, for or on account of antecedent debts. Said transfers were made while these debtors were insolvent, were made on or within ninety (90) days before the date of the filing of the Bankruptcy Petitions, and enabled said Defendants to receive more than these Defendants would receive if the transfers had not been made and these Defendants received payments of these debts to the extent provided by the provisions of Title 11, United States Code. The above-said Defendants receiving said transfers and the amounts of said transfers are as follows:

| NAME | PREFERENCE AMOUNT | | |
| | Interest | Principle | Total |
| --- | --- | --- | --- |
| Allred, Lee M. | $2,109.99 | 0.00 | 2,109.99 |
| Apkarian, Paul K. and Johann | $ 311.72 | 0.00 | 311.72 |
| Azvedo, Shirley and Jessie Azvedo and Manuel Azvedo | $2,835.44 | 3,500.00 | 6,335.44 |
| Bassett, Charlwood and David R. | $ 943.58 | 0.00 | 943.58 |
| Bono, Ray aka Raphael and Genevieve | $1,814.02 | 0.00 | 1,814.02 |
| Brown, Maritta Gibson | $ 970.71 | 0.00 | 970.71 |
| Buckley, C. H. and Ethel | $1,890.70 | 0.00 | 1,890.70 |
| Burbidge, Lester and Miriam E. | $ 223.74 | 0.00 | 223.74 |
| Calvert, Timothy J. | $ 417.06 | 3,400.00 | 3,817.06 |
| Ceccarelli, Ray | $ 486.01 | 0.00 | 486.01 |
| Cooper, David and Dorothy | $2,379.12 | 0.00 | 2,379.12 |
| Cronn, James W. and Charisse L. | $4,699.87 | 0.00 | 4,699.87 |
| Ellermann, Norman C. and Neola | $ 211.04 | 0.00 | 211.04 |
| Etchemendy, Henry and Peggy | $ 237.38 | 0.00 | 237.38 |
| Field, Donald F. and Fern I. | $ 720.81 | 5,000.00 | 5,720.81 |
| Gist, Ken and Marian | $ 854.61 | 0.00 | 854.61 |
| Gonterman, Theo | $ 632.41 | 0.00 | 632.41 |
| Hammill, C. H. and Virginia | $ 570.40 | 0.00 | 570.40 |
| Harkness, Mr. and Mrs. Eugene | $ 644.92 | 0.00 | 644.92 |
| Harris, Bill and Rosalyn | $1,436.12 | 0.00 | 1,436.12 |
| Harris, Bryan and Elaine | $1,911.65 | 0.00 | 1,911.65 |
| Hussman, Mildred and George | $2,047.82 | 0.00 | 2,047.82 |
| Jasper, Shannon | $ 323.30 | 0.00 | 323.30 |
| Johnson, John and Fern | $1,575.04 | 0.00 | 1,575.04 |

---

1. Because these bankruptcies were filed in 1982, the substantive changes made to Title 11 of the United States Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984 do not apply to this adversary proceeding. See Pub.L. No. 98–353, Sec. 553(a) (July 10, 1984). There-fore, references to "Bankruptcy Code" or "Code" are to the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101 to 151326, prior to the 1984 Amendments. "Bankruptcy Act" and "Act" refer to the former federal law, 11 U.S.C. §§ 1 to 1103 (repealed 1979).

| NAME | PREFERENCE AMOUNT | | |
|---|---|---|---|
| | Interest / | Principle / | Total |
| Jost, John W. and Susan Jost, Trustees for David Jost | $ 713.70 | 0.00 | 713.70 |
| Lampe, Theodor L. and Erma M. Lampe | $ 401.99 | 0.00 | 401.99 |
| Magrane, Robert T. and Ann M. | $ 415.31 | 0.00 | 415.31 |
| McAllister, Connie | $ 114.96 | 0.00 | 114.96 |
| McCleary, Eileen and Thomas G. | $ 318.32 | 0.00 | 318.32 |
| McCreary, Jack and Audia | $2,670.22 | 0.00 | 2,670.22 |
| Meierding, William and Day, Juanita | $ 274.50 | 0.00 | 274.50 |
| Messinger, Irene and George | $1,311.24 | 0.00 | 1,311.24 |
| Monroe, Thomas and Winifred G. | $ 646.76 | 0.00 | 646.76 |
| Nelson, Jacquelyn L. | $ 327.18 | 6,000.00 | 6,327.18 |
| Parker, Lewis F. and Loretta A. | $2,544.72 | 0.00 | 2,544.72 |
| Phen, Shwee Chin | $1,697.67 | 0.00 | 1,697.67 |
| Polanski, Anthony and Mable | $ 479.32 | 0.00 | 479.32 |
| Price, Ruby | $1,316.70 | 0.00 | 1,316.70 |
| Roberts, Warren H. and Lora E. | $1,400.62 | 10,000.00 | 11,400.62 |
| Romero, Richard and Rosina C. | $ 638.81 | 1,000.00 | 1,638.81 |
| Saint Francis of Assisi | $ 86.92 | 3,000.00 | 3,086.92 |
| Shives, John C. | $1,179.11 | 10,000.00 | 11,179.11 |
| Simoncini, Marc and Julia fka King, Julie | $ 388.81 | 10,000.00 | 10,388.81 |
| Squailia, Frances R. | $ 472.88 | 0.00 | 472.88 |
| Starkjohannm, Joyce E. | $ 213.21 | 0.00 | 213.21 |
| Thompson, James F. | $2,103.12 | 0.00 | 2,103.12 |
| Van Son, Mr. and Mrs. Adrian | $ 276.67 | 0.00 | 276.67 |
| Waiton, Richard and Marie | $2,346.84 | 0.00 | 2,346.84 |
| Wallis, Rev. Carl A. and Gloria A. | $1,009.65 | 0.00 | 1,009.65 |
| Weisman, Helen and Ackley, Robert | $ 431.24 | 0.00 | 431.24 |
| Windham, Elmer L. | $ 777.40 | 0.00 | 777.40 |
| Windham, Evelyn L. | $2,103.10 | 0.00 | 2,103.10 |

2. The above-said amounts represent payments on obligations of WWF and/or USSL evidenced by Promissory Notes, executed on behalf of WWF and/or USSL, made payable to the above-named defendants.

3. Debtors WWF and USSL were insolvent for the entire ninety (90) day period preceding the filing of the Bankruptcy Petitions, in that the liabilities of these debtors far exceeded their assets for this entire time period.

4. The operations of debtors WWF and USSL were, in essence, ponzi schemes, in that new investors' monies were needed and essential to make the payments of interest and principal to prior investors in these debtor companies. Further, none of the internally generated revenues of any of the debtor entities were significant enough or substantial enough to in any way have contributed to the payments to investors. Further, the operations of the other debtor entities needed the continual cash flow from investors to maintain their operations.

5. All of the investments of the defendants in WWF and/or USSL were made on a sporadic basis, and not as part of any ordinary or normal investment business activity.

### DISCUSSION and CONCLUSIONS OF LAW

■ Bankruptcy Code § 547(b) provides that the trustee may avoid any transfer of property of the debtor: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the bankruptcy petition, or between 90 days and one year if the creditor was an insider and had reasonable cause to believe the debtor was insolvent at the time of the transfer; and (5) that enables the creditor to receive more than it would have received if the transfer had not been made and the debtor's estate were liquidated according to the provisions of the Code. The purpose of giving this power to the Trustee is two-fold. By discouraging the creditor "race to the courthouse", Congress hoped that the financially troubled debtor might avoid a bankruptcy filing by securing the cooperation of his creditors. More important, the preference section is designed to "facilitate the prime bankruptcy policy of equality of distribution of the debtor's assets." *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–178 (1977), *reprinted in* 1978 Code Cong. & Admin. News 5787, 6138.

■ *Property of the Debtor*—In order for a transfer to be preferential, the transferee must receive property of the debtor, such that the transfer diminishes the fund from which similarly situated creditors are to be paid. *See generally Brown v. First National Bank*, 748 F.2d 490 (8th Cir. 1984); *Schilling v. Electronic Realty Associates, Inc.*, (*In re Hearn*), 49 B.R. 143 (Bankr.W.D.Ky.1985). The transfers at issue here are evidenced by checks drawn on the accounts of either WWF or USSL, in the amounts alleged by the trustee as found above, and honored by the drawee bank. This constitutes *prima facie* proof that these defendants received transfers of the debtors' property. *See e.g. Merrill v. Abbott* (*In re Independent Clearing House*), 41 B.R. 985, 1010–11 (Bankr.D. Utah 1984).

None of the defendants dispute the basic facts of the transfers; however, a group of defendants contend that the transfer of funds to them should be characterized as the repayment of money obtained by fraud or other inequitable conduct of the debtors. *See generally* 4 *Collier on Bankruptcy* ¶ 547.19 and ¶ 547.24 (15th ed.1985). Simply stated, the creditors' argument is that the debtors were engaged in a Ponzi-type fraudulent scheme, such that the investments did not become part of the debtors' estate, but were held in a constructive trust for the defrauded creditors. According to these creditors, the transfers alleged to be preferential were actually the restoration of the transferees' own money.

From at least the time of the original "Ponzi" scheme there have been many cases in which defrauded creditors have sought to defend against the trustee's avoiding powers by advancing the above argument. *See e.g. Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Rosenberg v. Collins*, 624 F.2d 659 (5th Cir.1980); *Clearing House*, 41 B.R. at 998–1004; *Lawless v. Anderson* (*In re Moore*), 39 B.R. 571 (Bankr.M.D.Fla. 1984); *Edmondson v. Bradford-White Corp.* (*In re Tinnell Traffic Services, Inc.*, 41 B.R. 1018 (M.D.Tenn.1984). In each case, the court declined the creditors' request, as this Court must.

A constructive trust is a remedial device, within the equitable discretion of the court, by which one who obtained property under inequitable circumstances is deemed to be a trustee for the benefit of one who in good conscience is entitled to it. *Danning v. Lum's, Inc.*, 86 Nev. 868, 871; 478 P.2d 166 (1970). Since it is a remedy, rather than a substantive right, a constructive trust arises only when imposed by a court. *See Tinnell Traffic*, 41 B.R. at 1021; *Clearing House*, 41 B.R. at 999. In the instant case, as in the many cases in which this defense has been raised, the creditors seek the *retroactive* imposition of a constructive trust, so that they may retain the funds already transferred.

■ The Court need not repeat here the thorough analyses of the courts which have already addressed this issue. *See e.g. Clearing House, supra,* at 998–1004. It is essential for a constructive trust that the defrauded party trace specific property to the alleged fraud or wrongful conduct. *Id.* As a general rule, *any* party who seeks to exempt trust property from the bankruptcy estate must identify the trust *res* in its original or substituted form. *Elliott v. Bumb*, 356 F.2d 749, 754 (9th Cir.), *cert. denied* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966).

■ As in *Clearing House*, defendants here have not attempted to trace their funds beyond deposit with the debtors. Tracing their investments to the promissory notes is not sufficient; they must trace their *payments* to the funds entrusted with the debtors. This they have failed to do. The evidence shows to the contrary that all invested funds were commingled and transferred among the general accounts of the debtors, and were used to pay earlier investors and general business expenses. The payments received by these defendants, rather than traceable to their own original deposits, were most likely the funds of *later* investors. If the trustee has no right to recover these payments, neither do these

defendants have any better right to retain them. *See e.g. Moore*, 39 B.R. at 574.

For these reasons, the imposition of a constructive trust here would not serve the cause of justice, and would inhibit the bankruptcy policy of equality of distribution. It would operate not against the debtors, but against other equally innocent investors, all "lured by the prospect of a deal too good to be true." *Id.* at 575. Rather than preventing unjust enrichment, the underlying rationale for the constructive trust remedy, it would give an advantage to those who invested earlier, for to the extent that they received any payments, they are the beneficiaries of the debtors' alleged fraud upon later investors. *Id.* at 574; *Clearing House, supra,* at 1004. As in *Cunningham v. Brown*, 265 U.S. at 13, 44 S.Ct. at 427, and the other cases cited above, these circumstances "call strongly for the principle that equality is equity."[2]

■ *To or for the Benefit of a Creditor*—A creditor is defined as an entity that has a claim against the debtor's estate. Code § 101(9). A claim is defined in § 101(4) as any right to payment, even if unliquidated, unmatured or contingent. In order for a transfer to be avoided as preferential, the transferee must be a creditor at the time of the transfer. 4 *Collier, supra* at 547–64 (15th ed.). The defendants here had claims for payment at the time of the transfers which arose from the promissory notes executed earlier on the debtors' behalf. No defendant disputes the trustee's allegation that he had received the payment evidenced by the check made payable to the defendant. Therefore, the trustee has established this element.

■ *For or on Account of an Antecedent Debt*—"Debt" is defined as liability on a claim. Code § 101(11). "The terms 'claim' and 'debt' are coextensive. A creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor." *Clearing House*, 41 B.R. at 1011. Although "antecedent debt" is not defined in the Code, it may be described as pre-existing or prior debt, so as to preclude the avoidance of a transfer made simultaneous with or prior to the extension of credit or transfer of value to the debtor. 2 *Norton Bankruptcy Law and Practice* § 32.07 (1981 ed.) *See Dean v. Davis*, 242 U.S. 438, 443, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917) (preference implies paying or securing a pre-existing debt of the person preferred, rather than a substantially contemporaneous exchange). Therefore, any "prior debt which is reduced or discharged as a result of payment within 90 days of bankruptcy is an antecedent debt...." *Clearing House, supra,* at 1011. Upon execution of the promissory notes made payable to these defendants, the debtor incurred an obligation to repay the principal amount advanced together with a fixed rate of interest. The transfers made on account of those obligations were payments "on account of an antecedent debt" within the meaning of § 547(b)(2). *See id.*

Defendant Church of St. Francis of Assisi contends that its receipt of principal and interest was not on account of an antecedent debt, arguing that a debt is incurred when it is due.[3] Defendant's theory, if accepted, would exclude from avoidance all

---

2. Defendants urge that complete equity cannot be achieved here, because earlier investors who received payments beyond the 90 day preference period will benefit by the debtors' wrongdoing. The only possible answer is that the Bankruptcy Code cannot be expected to provide a complete remedy for every commercial wrong. The Court's equitable powers are limited by the express provisions of the Code. *See Clearing House* 41 B.R. at 1005 and cases cited. Section 547 is intended to promote equality of distribution, and "it is no reflection on the statute that it does not do so entirely." *Id.* at 1010, quoting *Pirie v. Chicago Title & Trust Co.,* 182

U.S. 438, 449, 21 S.Ct. 906, 911, 45 L.Ed. 1171 (1901). The Trustee here did not advance any theory by which the Court could require that even earlier transferees disgorge their payments.

3. Most discussions of when a debt is incurred take place within the context of § 547(c)(2)(B). To the extent that the Court must consider this issue in order to determine what is an antecedent debt, the same considerations are relevant, and the Court will apply the principles of those discussions in its analysis below.

payments of current obligations. There are several reasons for rejecting this position.

■ First, as noted above, a debt is a liability on a claim, § 101(11), and "claim" means, *inter alia*,

right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured, or unsecured ...

11 U.S.C. § 101(4)(A). As soon as the promissory notes were signed, and the investors' funds transferred to the debtor, the investor had a claim against the debtor, and the debtor had an unmatured liability for the principal and an unmatured, and perhaps also contingent liability for interest. *See Wickham v. United American Bank, (In re Property Leasing & Management, Inc.)*, 46 B.R. 903, 913 (Bankr.E.D. Tenn.1985). The accepted view as to when a debt is incurred accords with the definitions of "debt" and "claim" found in Code § 101. A debt is incurred when the debtor first becomes obligated to pay. *See Nolden v. Van Dyke Seed Co. (In re Gold Coast Seed Co.)*, 751 F.2d 1118, 1119 (9th Cir.1985), *citing In re Emerald Oil Co.*, 695 F.2d 833, 837 (5th Cir.1983) and *Barash v. Public Finance Corp.*, 658 F.2d 504, 511 (7th Cir.1981). This is true even though the debt is at first unmatured or contingent. *Property Leasing, supra; New York Credit Adjustment Bureau Inc. v. Just In-Materials Designs, Ltd. (In re Vasu Fabrics, Inc.)*, 39 B.R. 513, 516–17 (Bankr.S.D.N.Y.1984). Furthermore, a debtor's obligation to pay first arises "whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt." *Barash*, 658 F.2d at 509. This occurs "upon performance, delivery, or its equivalent—not when payment is due." *Morton Shoe Cos. v. Herbert & Boghosian, Inc. (In re Morton Shoe Cos.)*, 36 B.R. 14, 16 (Bankr.D.Mass.1983). *See also Ray v. Gulf Oil Products (In re Blanton Smith Corp.)*, 37 B.R. 303, 307 (Bankr. M.D.Tenn.1984); *Naudian Inc. v. Schaad Detective Agency (In re Naudian, Inc.)*, 32 B.R. 875, 879 (Bankr.E.D.Pa.1983).

■ In the matter *sub judice*, the consideration giving rise to the debts at issue was exchanged at the time the "investments" were made and the promissory notes executed. At that time, the obligation to pay both principal and interest was incurred for the purpose of § 547(b)(2). The import of the above cases is that the payment of a current obligation—*i.e.*, an obligation currently due and owing—does not take the transfer out of § 547(b)(2), for a current obligation to pay may arise from an antecedent debt. Thus "current obligation" and "antecedent debt" are not mutually exclusive terms. *See e.g. A.I. Credit Corp. v. Drabkin (In re Auto-Train Corp.)*, 49 B.R. 605, 612 (D.D.C.1985). Contrary to the Church's view, it is irrelevant that investors could have or often did "roll-over" their investments rather than require payment when the notes matured or interest was due. A creditor always has the option of waiving or postponing his debtor's obligation to pay; this does not mean that the obligation has not previously been created, but merely that payment is not yet required. *See e.g. Keydata Corp. v. Boston Edison Co. (In re Keydata Corp.)*, 37 B.R. 324, 327 (Bankr.D.Mass. 1983) (utility bill context).

■ Various creditors also contend that a liability to pay interest is incurred each day as interest accrues, citing *Iowa Premium Service Co. v. First National Bank (In re Iowa Premium Service Co.)*, 695 F.2d 1109 (8th Cir.1982). This argument will be considered in more detail below, in connection with the "45-day rule" of the ordinary course of business exception to preferences found in § 547(c)(2). For purposes of the "antecedent debt" requirement, however, even if this view were accepted, the payment of interest due would nevertheless be "on account of an antecedent debt": The debtors paid interest for one month *after* it had accrued, at the beginning of the next month.

■ The second reason for rejecting the Church's interpretation of "antecedent

debt" is that it would pervert the purpose of the "ordinary course of business" exception found in § 547(c)(2). This section excepts from avoidance those preferences which were:

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;[4]

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms.

The creditor has the burden of proving each of these four elements. *Blanton Smith*, 37 B.R. at 306–307; *Clearing House*, 41 B.R. at 1014.

The purpose of subsection (c)(2) was to protect from preference liability ordinary trade credit transactions that are kept current. *Id.* Several courts have noted that the Bankruptcy Act had no provision comparable to Code § 547(c)(2); rather, payments of current business expenses were protected from preference avoidance by the judicially-created doctrine that current expenses are not antecedent debt. *Emerald Oil*, 695 F.2d at 836; *Barash*, 658 F.2d at 510–511; *In re Peninsula Roofing & Sheet Metal Inc.*, 9 B.R. 257, 261–62 (Bankr.W.D. Mich.1981). These same courts indicate, however, that Code § 547(c)(2) was intended to replace this doctrine.

This Congressional purpose would be thwarted if courts were to retain the "current expense rule" as a gloss on the definition of "antecedent debt". If the Trustee were unable to establish the antecedent debt element of his *prima facie* case, then the (c)(2) exception would not come into play, and the creditor would not have the burden of proving that the debt was incurred and payment made in the ordinary course of business, or according to ordinary business terms, thus substantially weakening the trustee's avoidance powers.

Not only ordinary, but extraordinary or unusual credit transactions would be immunized as long as they were paid when "due". Furthermore, the Church's interpretation would encourage creditors to manipulate their demands for payment or the timing of their bills, so that a creditor who foresees a debtor's financial difficulties would be able to avoid preference liability by determining the date the debt is incurred. *See Emerald Oil, supra*, at 837. This would promote, rather than deter, the "race of diligence", and would undermine the primary Code object of securing equality of treatment for all similarly-situated creditors.

For all the above reasons, considering the general purposes of the preference section, and the Congressional intent in enacting subsection (c)(2), as well as the definitions of "debt" and "claim" found at Code § 101(11) and 101(4) respectively, the Court cannot agree that "antecedent debt" should be defined so as to exclude the payment of a "current obligation". The latter is now covered by an express affirmative defense, pursuant to which these defendants will prevail only if they establish all four elements. Therefore, the Court concludes that the Trustee has proved the § 547(b)(2) element.

*Made While the Debtor was Insolvent* —Insolvency is determined by the traditional balance sheet test of 11 U.S.C. § 101(26), which compares assets to liabilities. Section 547(f) provides the Trustee with a presumption of the debtor's insolvency during the 90 days immediately preceding the bankruptcy filing. This presumption is governed by Fed.R.Evid. 301, pursuant to which the Trustee need not present evidence of the presumed fact unless the defendant first comes forward with some evidence to rebut the presumption. *Emerald Oil*, 695 F.2d at 838–39; *Clearing House*, 41 B.R. at 1011; *Vasu Fabrics*, 39 B.R. at 516.

---

**4.** This element has been eliminated by the 1984 Amendments and subsequent subsections relet- tered.

Rather than rest on the presumption, the Trustee put in evidence of the debtors' financial condition at the time of the bankruptcy filings, and in April of 1981, over one year before the filings. Although the defendants questioned the accuracy of the April 1981 balance sheet, suggesting that the Trustee may have undervalued assets in existence at that time, this by itself is insufficient to constitute evidence of solvency 90 days prior to bankruptcy. Indeed, even if the Court were to add $1.4 million to the April 1981 assets as defendants suggest, the debtors would nonetheless have been insolvent at that time. Since the Trustee's evidence shows that the debtors' financial condition worsened over the next year by many millions of dollars, the Court has no difficulty concluding that the Trustee has established the § 547(b)(3) element.

*Made Within 90 Days of Bankruptcy* —No defendant contested this element of the Trustee's case. The Trustee seeks to avoid payments evidenced by checks dated no earlier than March 18, 1982. Whether the Court counts the 90 days backward from June 16, the date of the WWF and USSL filings, or forward from the date of the transfer, any payments made March 18 or later will be within the 90-day period. *See Schneider v. Phillips AG Chemical Co. (In re Schneider)*, 44 B.R. 961 (Bankr. W.D.Wis.1984); 4 *Collier on Bankruptcy* ¶ 547.28 (15th ed.). Therefore, the § 547(b)(4) element is met.

*That Enables the Creditor to Receive More than He Would Have Received Without the Transfer.*—Section 547(b)(5) requires that the Trustee prove that if unavoided, the transfers would enable the defendants to receive more than they would have received if the transfers had not been made, and the debtors' estate were liquidated according to the provisions of the Bankruptcy Code. The Court is to construct a hypothetical liquidation of the estate in order to determine the actual effect of the payments. *Clearing House,* 41 B.R. at 1012–13.

The Trustee's evidence shows that there are several hundred "investor" creditors who are owed in excess of $6 million, and that the estate's assets are negligible compared to that amount. As in *Clearing House,* the Trustee here has not constructed a detailed hypothetical liquidation, yet it is clear that the transfers sought to be avoided satisfy this final element. The Court need only determine that these creditors would receive less than 100 percent of their claims. *Id.* at 1013. If the dividend would be less than 100%, the defendants would "receive more" if allowed to retain the payments, and also share in a pro-rata distribution on any remaining claims. *See Barash,* 658 F.2d at 509–10; *Orth-O-Vision, Inc. v. Wometco Home Theatre, Inc. (In re Orth-O-Vision Inc.)*, 49 B.R. 943, 945 (Bankr.E.D.N.Y.1985); 3 *Collier on Bankruptcy* (Part 2) ¶ 60.35 (14th ed.). There is no doubt that there will not be a 100 percent dividend to creditors.

As the Trustee has met his burden of proving the *prima facie* elements of a preference, the defendants may avoid liability only by proof that their payments fall within one or more of the exceptions enumerated in § 547(c). Of these, the only defense raised at trial was the "ordinary course of business" exception of § 547(c)(2)[5], whose elements are outlined above.

No defendant has convinced the Court that each element of this exception applies to his payments. Of all the defendants, only the Waitons put in evidence that one of their notes was executed, and hence the

---

**5.** In their trial statement, the Waitons argued that their April 1 receipt of $1,116.70 for interest should be excepted from avoidance under § 547(c)(4), the "subsequent advance rule", contending that they invested an additional $129,-500.00 on the same day. However, these defendants did not prove that the April 1 note was given for "new value", nor that the investment came *after* the transfer sought to be avoided by the trustee. It is critical for the operation of (c)(4) that new value be advanced *subsequent* to the transfer at issue, even if both transactions occur on the same day. *See McClendon v. Cal-Wood Door (In re Wadsworth Building Components)*, 711 F.2d 122, 123 (9th Cir.1983); *Gold Coast Seed Co. v. Spokane Seed Co. (In re Gold Coast Seed Co.)*, 30 B.R. 551 (Bankr. 9th Cir. 1983).

obligation to pay incurred, no more than 45 days before the transfer sought to be avoided. § 547(c)(2)(B).

■ Certain defendants urge that a debt is incurred when due, so that all timely payments would satisfy the (c)(2)(B) element. As discussed above in connection with the meaning of "antecedent debt", the courts uniformly hold that an obligation to repay the principal portion of a loan or investment is incurred when the debtor received the funds. For the reasons already set forth, this Court follows that view.

■ The only disagreement among the courts involves the obligation to pay interest. Citing *Iowa Premium* as support, the defendants contend that 45 days worth of interest payments satisfy (c)(2)(B) because such an obligation is incurred as interest accrues over time. Although the *Iowa Premium* court appears to agree with the general rule that a debt is incurred when consideration for the debt passes to the debtor, the court likened the use of money over time to the use of utility service or leased property over time. 695 F.2d at 1111–1112. These analogies are ill-founded, as Judge Ross so well explains in his dissenting opinion. *Id.* at 1113–1114. Certainly, once the debtors received the invested funds, consideration for the payment of both principal and interest passed; the debtor does not consume a new resource over time. Further, the Court agrees with Judge Bare's analysis and criticism in *Property Leasing*, 46 B.R. at 913–14. The *Iowa Premium* view is precluded by the definitions of "debt" and "claim" found in § 101. According to these provisions, a debt for interest is incurred when the debtor obtains the funds, even if at that time the obligation is unmatured and contingent.

■ Finally, no defendant here attempted to bring his payments within the facts of *Iowa Premium*. That court stressed the contingent nature of the debt at issue, for the loans there were subject to prepayment or payment on demand. 695 F.2d at 1110. The court found that the amount of interest the debtor was obligated to pay

was not reduced to a sum certain as of the date of the execution of the note. *Id.* at 1111. The contrary appears to be the case here, and the defendants offered no evidence to prove otherwise.

The remaining sub-elements of (c)(2) concern the various "ordinary course" requirements. Little was offered to prove these elements. No defendant put in evidence that payments were made according to ordinary business terms. § 547(c)(2)(D). Only Lee Allred testified as to his investment practices, in an attempt to prove that the debtors' obligations to him were incurred and payments made in the ordinary course of Allred's financial affairs. § 547(c)(2)(A), (C). Defendants failed to prove that their investments were anything but sporadic and not part of any normal or ordinary investment business.

■ Defendants strenuously argue that subsection (c)(2) should include payments made to "consumer transferees" as well as to professionals. The Court cannot agree under the facts of this case. The purpose of the (c)(2) exception is to protect *ordinary* trade credit transactions which are kept current, because "it does not detract from the general policy of the preference section to discourage *unusual* action by either the debtor or his creditors." *Waldschmidt v. Ranier (In re Fulghum Construction Corp.)*, 45 B.R. 112, 116 (Bankr.M.D.Tenn.1984), quoting S.R. 989, 95th Cong. 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, p. 5874. No professional lender or investor would have risked its funds in these debtors; these companies and others like them thrive for a short time only because they are able to prey on the hopes of the "consumer investor." No one who truly understood the financial set-up and operations of these debtors would have invested with them, unless the investor hoped to get his money out before the companies' inevitable financial collapse. These activities and motivations are "unusual and extraordinary", and should be discouraged rather than protected.

For similar reasons, the Court is not convinced that the debts were incurred and payments made in the ordinary course of business of the *debtors*; nor could payments have been made according to ordinary business terms. In this respect, the Court will follow the *Clearing House* reasoning, 41 B.R. at 1014–15, to the effect that a Ponzi-type of arrangement is not "ordinary" and not the kind of enterprise whose protection was intended by the drafters of (c)(2). The Court is mindful that *Clearing House* was a "pure" Ponzi scheme, with absolutely no legitimate business operations, while the debtors here were engaged in an alarm leasing business and related activities. This distinction cannot help these defendants. First, no creditor attempted to link his transactions with the debtors to any legitimate business activity. Second, the trustee's uncontroverted evidence establishes that the internally-generated revenue of these debtors could not possibly have played any significant role in the repayment of investors. The evidence shows to the contrary that many millions of dollars were acquired from public investors and apparently squandered either fraudulently or nonfraudulently. New investor funds were absolutely essential for these companies to keep their doors open, yet the longer they remained open the more people were harmed. The overall operation involving the investors was a Ponzi scheme, which should be denied (c)(2) protection. There may be other cases in which it will be difficult to draw this line, but this case is not one of them.

The Court must consider these transactions "for what they actually were, irrespective of what the investors thought they were." *Id.* at 1014. Considerations similar to those discussed under the constructive trust argument enter in here. To apply (c)(2) to immunize these activities "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims." *Id.* at 1004. These defendants received the funds from investments made on the eve of bankruptcy, by persons who recovered nothing. Equity requires that these creditors all share equally in whatever assets are available. *See id.* at 1010 n. 4. If decisions such as this and *Clearing House* help to discourage these Ponzi arrangements by encouraging more careful investment activities on the part of the ordinary "consumer investor", there will be fewer defrauded creditors to sit at the defendant's table in preference suits in the future.

Judgment shall be entered accordingly.