**In re HEDGED–INVESTMENTS ASSOCIATES, INC., Debtor.**

**Harvey SENDER, Trustee, Appellee,**

v.

**The NANCY ELIZABETH R. HEGG-LAND FAMILY TRUST, and Radoy W. Heggland, Appellants.**

No. 94–1027.

United States Court of Appeals,
Tenth Circuit.

Feb. 13, 1995.

Before BRORBY, McWILLIAMS and EBEL, Circuit Judges.

BRORBY, Circuit Judge.

The Nancy Elizabeth R. Heggland Family Trust and Radoy W. Heggland (referred to collectively as the "Heggland Trust") appeal the district court's decision affirming the bankruptcy court's determination that a payment made to the Heggland Trust by Hedged Investments Associates, Inc., was void as a preference. We have jurisdiction under 28 U.S.C. § 158(d), and affirm.

## BACKGROUND [1]

This case arises from an investment "Ponzi" scheme [2] perpetrated by James Donahue and his wholly-owned corporation, Hedged Investments Associates, Inc. (HIA), via three limited partnerships: Hedged Investments Associates, LP; Hedged Securities Associates II, LP; and Hedged Securities Associates, LP (HSA). The essence of the scheme

was to attract investors by guaranteeing substantial returns from stock options trading. Mr. Donahue paid "profits" to earlier investors with the investment capital of later investors, publicly reporting false earnings as "proof" of his success. Despite making some profitable trades, Mr. Donahue and HIA amassed approximately $136 million in trading losses over the thirteen year life of the scheme. From 1977 until the scheme's collapse in August 1990, Mr. Donahue and HIA fraudulently enticed 1,636 investors to place their funds with him. The bankruptcy files indicate that 1,373 people have filed proofs of claims in excess of $400 million. Actual cash losses by investors in the scheme are approximately $200 million.

According to Leslie Patten, plaintiff's expert witness, all investor funds and lender funds were deposited into and paid out of HIA's bank account. Mr. Patten testified that HIA had the only bank account of any of the "Hedged Investment entities." He opined there was no way to trace the funds which were paid out of HIA's account to individual investors or limited partnerships. HIA did not allocate net trading gains or losses to investors.

James Collins, defendants' expert witness, testified that Mr. Donahue's books and records were not reliable since all funds from the limited partnerships were commingled in the same account. Mr. Donahue admitted all of the funds from all of the investors had been commingled into HIA's account.

In August 1986, the Heggland Trust invested $200,000 in a limited partnership known as JDB Group II, whose name was later changed to BCD Group, LP. This limited partnership was one of a number of "sub-limited" partnerships formed for the purpose of investing in HIA's various limited

---

1. Both parties have failed to include citations to the record in their briefs when laying out the underlying facts of this case in violation of Fed. R.App.P. 28(a) and 28(e), and 10th Cir.R. 28.1. Those facts are, however, undisputed. Nearly all of the facts in the following section have been taken from the bankruptcy court's opinion.

2. A "Ponzi" scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through

the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

*In re Independent Clearing House Co.,* 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984) (citations omitted).

partnerships. In this case, JDB Group II was to use the funds invested by the Heggland Trust to purchase limited partnership interests in HSA.

In May 1990, the trustee for the Heggland Family Trust, Mr. Radoy W. Heggland, requested the investment be liquidated. On June 9, 1990, HIA issued a check from its account payable to "BCD Group—FBO Nancy Heggland Family Trust," in the amount of $50,000. Mr. Heggland testified he negotiated the check, and that it cleared on June 18 or 19, 1990.

On August 30, 1990, HIA filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On September 7, 1990, the case was converted to a Chapter 7 petition and Harvey Sender was appointed Trustee. This adversary proceeding is one of more than 180 such cases commenced by the Trustee to avoid and collect preferential payments, avoidable transfers, and overpayments of limited partners' capital accounts. The Trustee's complaint asserted a claim under 11 U.S.C. § 547 to recover the $50,000 payment made to the Heggland Trust within ninety days of HIA's bankruptcy petition on the grounds the transfer was a preference. Alternatively, the complaint stated a claim under 11 U.S.C. § 548(a)(2) to recover amounts paid to the Heggland Trust as a fraudulent transfer.

Trial to the bankruptcy court was held May 3, 1993. The court entered judgment in favor of the Trustee on the preferential transfer claim. Additionally, the court rejected the defenses raised by the Heggland Trust. Specifically, it held the Trustee was not collaterally estopped from contending the Heggland Trust was a creditor of HIA and that the operations of HIA and the limited partnerships should be considered separate.

Finally, the court rejected the Heggland Trust's argument that the transfer occurred in the ordinary course of business and is therefore immune from recovery under 11 U.S.C. § 547(c)(2). The district court, sitting as an appellate court, see Fed.R.Bankr.P. 8013, affirmed, and this appeal followed.[3]

■ In reviewing a district court's decision affirming the decision of a bankruptcy court, this court will not disturb the bankruptcy court's findings of fact unless they are clearly erroneous; however, conclusions of law are reviewed de novo. In re Reliance Equities, Inc., 966 F.2d 1338, 1340 (10th Cir.1992).

## DISCUSSION

### A. COLLATERAL ESTOPPEL

■ The Heggland Trust first argues the Trustee should be collaterally estopped from relitigating the issue of HIA's solvency at the time of the transfer.[4] In support, they rely on Sender v. Johnson, Adversary Proceeding No. 91–1795 SBB (Bankr.D.Colo., Oct. 6, 1992). In Sender, the bankruptcy court concluded HIA and the limited partnerships were a single operation and the investors were limited partners. However, the court also held the operation's obligations to the investors, on account of their equity contributions, did not constitute debt. Thus, the court concluded the HIA operation was not insolvent and the Trustee's §§ 547 and 548 claims should fail. The Heggland Trust argues the bankruptcy court erred in refusing to apply the doctrine of collateral estoppel and reaching the merits of the Trustee's claims.

Assuming, arguendo, the bankruptcy court erred in refusing to apply collateral estoppel, subsequent events have rendered that error

---

3. The district court affirmed the bankruptcy court's decision without a written opinion. Although the district court's order dismissing the appeal indicates that oral conclusions of law were made at the end of oral arguments, that portion of the record has not been provided to this court. As such, we refer to the bankruptcy court's decision as the one under review in this proceeding.

4. More specifically, the Heggland Trust maintains:

[T]he Trustee should be estopped from [relitigating the issue] that HIA, Inc. [was] an investment pool composed of it and the Hedged Limited Partnerships [that] was solvent at the time of the subject transfer [because] if the investment pool would be split apart, and if HIA, Inc. and the Hedged Limited Partnerships were to be viewed separately, then they received the property of the Hedged Limited Partnerships—not HIA, Inc.—and that the Hedged Limited Partnerships were solvent at the time of the transfer....

moot. After the commencement of this appeal, the United States District Court for the District of Colorado reversed *Sender. Sender v. Johnson,* No. 92–C–2287 (D.Colo. Sept. 6, 1994). As such, there is no longer any "final decision on the merits" as required to apply the doctrine of collateral estoppel. *See Clough v. Rush,* 959 F.2d 182, 187 (10th Cir.1992).

The Heggland Trust maintains, however, the reversal of *Sender* does not change the fact that the bankruptcy court erred in refusing to apply collateral estoppel because at the time the court's decision was handed down, *Sender* was good law. While perhaps technically correct, *Timberlake v. Southern Pac. Co.,* 420 F.2d 482 (10th Cir.1970) (per curiam), elucidates the practical fallacy of this argument.

In *Timberlake,* the appellant sought to quiet title in certain lands under a theory of abandonment. The trial court dismissed the action as subject to the rule of *res judicata* on the basis of two state court decisions that had rejected appellant's claims. *Id.* at 483. Prior to perfecting the appeal before this court, the New Mexico Supreme Court reversed one of the lower state court judgments and held the question of abandonment was not to be regarded as *res judicata. Id.* Thus, we held, "[i]t follows that the premise of the federal district court's judgment is no longer valid under state law and that the judgment must be vacated and the cause remanded for further consideration in light of the judgment and opinion of the New Mexico Supreme court." *Id.*

As in *Timberlake,* the prior decision that the Heggland Trust would have bind the bankruptcy court is no longer valid. Thus, if the district court had relied on *Sender,* we would be compelled to reverse that decision because it would be based on invalid law, and remand the case for further proceedings. Those proceedings would, of course, require consideration of the merits of the Trustee's claims as they would no longer be subject to

the rule of *collateral estoppel.* The fact the bankruptcy court refused to apply collateral estoppel and passed on the merits of those claims illustrates the fallacy of the Heggland Trust's argument. The allegation of error concerning application of the doctrine of collateral estoppel is rendered irrelevant as no final judgment exists.

## B. SECTION 547(b) CLAIM

■ The Heggland Trust argues the bankruptcy court erred in concluding the $50,000 transfer was a preference under 11 U.S.C. § 547(b), and therefore voidable. The Heggland Trust maintains the monies received were not the property of the estate of HIA, but of the limited partnerships.[5] More specifically, the argument rests on the conclusion that the monies deposited with HIA by the limited partnerships created a trust under Colorado law, and as such, did not constitute the property of HIA but remained that of the limited partnerships.

Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

 (A) the case were a case under chapter 7 of this title;

---

5. Thus, the Heggland Trust argues the applicable date of filing for bankruptcy for determining whether the transfer was received within ninety days of that filing is that of the limited partnerships. HIA filed its petition for bankruptcy protection on August 30, 1990. The first petition in

bankruptcy filed on behalf of a limited partnership occurred on September 28, 1990. Thus, the trust argues the transfer took place 111 days before the applicable filing date. It concedes that the transfer occurred within ninety days of HIA's filing.

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The bankruptcy court determined the elements of § 547(b) were met. This conclusion hinged on its finding that the monies invested via the limited partnerships were the property of HIA. While the Heggland Trust argues the entirety of the bankruptcy court's § 547(b) analysis is erroneous, it takes issue only with the finding that the funds held by HIA were the property of HIA.

The Heggland Trust argues that under Colorado law, when property held by a general corporate partner of a limited partnership or partnerships is commingled with the general partner's property, all of the property is presumed to be partnership property held in trust for the partnerships. Thus, the Heggland Trust concludes that all of the money in HIA's bank account was held in trust by HIA for HSA and the other limited partnerships, and unless the Trustee proved some of it belonged to HIA, it should be deemed trust property.

■ "It is beyond peradventure that, as a general rule, any party seeking to impress a trust upon funds for purposes of exemption from a bankrupt estate must identify the trust fund in its original or substituted form." *First Federal of Michigan v. Barrow*, 878 F.2d 912, 915 (6th Cir.1989); *see also, Cunningham v. Brown*, 265 U.S. 1, 11, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924); *In re Mahan & Rowsey, Inc.*, 817 F.2d 682, 684 (10th Cir.1987); *Rosenberg v. Collins*, 624 F.2d 659, 663 (5th Cir.1980); *In re Cardian Mortgage Co.*, 122 B.R. 255, 259 (Bankr.E.D.Va. 1990); *In re Dobbs*, 115 B.R. 258, 271 (Bankr.D.Idaho 1990).

When property of the estate is alleged to be held in trust, the burden rests upon the claimant to establish the original trust relationship. He must prove his title, identify the trust fund or property, and where the fund or property has been mingled with the general property of the debtor, the claimant must sufficiently trace the property.

. . . .

Once the trust relationship has been established, one claiming as a *cestui que trust* thereunder must identify the trust fund or property in the estate, and, if such fund or property has been mingled with the general property of the debtor, sufficiently trace the trust property. If the trust fund or property cannot be identified in its original or substituted form, the cestui becomes merely a general creditor of the estate. . . .

4 *Collier on Bankruptcy*, ¶ 541.13, at 541–76 to 79 (15th ed. 1994) (footnotes omitted). *See also Elliott v. Bumb*, 356 F.2d 749, 753 (9th Cir.), *cert. denied*, 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966); *Sonnenschein v. Reliance Ins. Co.*, 353 F.2d 935, 937 (2d Cir. 1965); *In re Independent Clearing House Co.*, 77 B.R. 843, 854 (Bankr.D.Utah 1987) (holding, in the context of a Ponzi scheme, that "when a debtor obtains money by fraud and mingles it with other money ... the money is 'property' of the debtor within the meaning of sections 547 and 548 of the Code"). This principle holds true regardless of whether the funds are held in an express or constructive trust. *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217 n. 3 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988).

It is undisputed that the commingling of all the invested funds by HIA has made it impossible to trace any of those funds. Thus, even if the Heggland Trust is correct in asserting that a trust was created under Colorado law, it cannot claim trust funds of the bankrupt estate because there is no way to trace those funds. We conclude, therefore, the bankruptcy court did not err in finding the $50,000 transfer to the Heggland Trust constituted a preference and is thus avoidable under § 547(b).

## C. SECTION 547(c)(2) DEFENSE

Finally, the Heggland Trust argues the $50,000 transfer occurred in the ordinary course of business between HIA and its limited partnerships, and is therefore immune from recovery under 11 U.S.C. § 547(c)(2)(B). We are not persuaded.

Section 547(c)(2) creates one of a number of exceptions to the general avoidance provision of § 547(b). Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer—

. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

■ The purpose of this section is to leave undisturbed normal financial relations, because doing so does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy. *See* 11 U.S.C.A. § 547 at 141. "This section is intended to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." 4 *Collier on Bankruptcy*, ¶ 547.10 (15th ed. 1991).

■ Several courts have considered applicability of the ordinary course of business defense in the context of a Ponzi scheme. The Trustee urges we adopt the rule of the Ninth Circuit holding the defense does not apply to transfers made in the course of a Ponzi scheme. *E.g., In re Bullion Reserve*, 836 F.2d at 1219 ("transfers made in a 'Ponzi' scheme are not made in the ordinary course of business" (footnote omitted) (citing *Graulty v. Brooks*, 819 F.2d 214, 216–17 (9th Cir. 1987)); *accord Wider v. Wootton*, 907 F.2d 570, 572 (5th Cir.1990) (holding § 547(c)(2) does not apply in the context of a Ponzi scheme, relying exclusively on ninth circuit precedent); *In re Montgomery*, 123 B.R. 801, 814–15 (Bankr.M.D.Tenn.1991) (same); *In re American Continental Corp.*, 142 B.R. 894, 900 (D.Ariz.1992) (same); *In re Baker & Getty Fin. Serv., Inc.*, 88 B.R. 792, 799 (Bankr.N.D.Ohio 1988) (same); *In re South-*

*ern Indus. Banking Corp.*, 87 B.R. 524, 525 (Bankr.E.D.Tenn.1988) (same).

The Heggland Trust argues we should reject this line of authority on the grounds that prohibiting application of the ordinary course of business defense for *all* transfers made in the course of a Ponzi scheme cannot be squared with either the terms or purposes of § 547(c)(2). We agree.

The authorities cited above adopt the bright line rule that because " 'Congress intended the ordinary course of business exception to apply only to transfers by legitimate business enterprises,' " *In re American Continental*, 142 B.R. at 900 (quoting *In re Bullion Reserve*, 836 F.2d at 1219), the exception has no application in the context of a Ponzi scheme. Strikingly, however, none of those cases cite any language or legislative history in support of this proposition. Rather, it appears to us that this bright line rule has developed solely from precedent which does not support it.

*In re American Continental* cites *In re Bullion Reserve* which in turn cites *Graulty* for the bright line rule. The holding of *Graulty*, apparently the first case to adopt the rule, is based on two bankruptcy cases: *In re Independent Clearing House Co.*, 41 B.R. 985 (Bankr.D.Utah 1984), and *In re Western World Funding, Inc.*, 54 B.R. 470 (Bankr.D.Nev.1985). Neither of those cases supports the proposition that transfers made in the course of a Ponzi scheme cannot be protected by the ordinary course of business exception. On the contrary, *In re Independent Clearing House*, specifically holds:

While "ordinary course of business" is not expressly defined in the Bankruptcy Code, it appears that the purpose of Section 547(c)(2) was to protect from preference liability ordinary trade credit transactions that are kept current, including payment of monthly utility bills. . . . Congress found in Section 547(c)(2) a means to protect *normal financial relations* between the debtor and its creditors.

. . . .

[I]t is clear that Congress did not intend to protect one group of *investors* in a "Ponzi" scheme over the rest.

*Id.*, 41 B.R. at 1014 (emphasis added, citations omitted). Likewise, *Western World* held that § 547(c)(2) could not be applied to fraudulent investment and repayment transactions for "[t]o apply (c)(2) to immunize these activities 'would lend judicial support to "Ponzi" schemes by rewarding early *investors* at the expense of later victims.'" *In re Western World Funding*, 54 B.R. at 481 (emphasis added) (quoting *In re Independent Clearing House*, 41 B.R. at 1004).

Thus, the precedent relied on by the Ninth Circuit in *Graulty* and its progeny do not support the sweeping rule that § 547(c)(2) has absolutely no application in the context of a Ponzi scheme. Rather, that precedent supports only the narrower proposition that transfers to *investors* are not entitled to the ordinary course of business exception. This narrower rule is not based, however, on the grounds that Congress did not intend to cover illegitimate businesses under § 547(c), but on the grounds that transfers to investors in a Ponzi scheme are not transfers made "according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C). The ordinary business terms of investment companies does not include payment of fraudulent "profits" to early investors that those investors did not earn, but are made possible only by the investments of later investors—the *sine qua non* of a Ponzi scheme. Thus, the literal terms of § 547(c)(2)(C) preclude application of the ordinary course of business defense to transfers made to *investors* in the course of a Ponzi scheme.

In contrast, none of the provisions of § 547(c)(2) preclude its application to transfers made to noninvestor-creditors in the ordinary course of business and according to ordinary business terms. Moreover, the purposes of § 547(c)(2) clearly are served by permitting its application to noninvestor-creditors whose transfers are received in the ordinary course of business. Again, the purposes of § 547(c)(2) are to leave undisturbed normal financial relations, because doing so does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy, *see* 11 U.S.C.A. § 547 at 141, and to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee. 4 *Collier on Bankruptcy,* ¶ 547.10 (15th ed. 1991). If, for instance, a Ponzi scheme uses telephone services, is billed for that service, and pays the phone company, disallowing the avoidance of that payment following a bankruptcy petition is consistent with the purposes of § 547. In addition, it is consistent with the over arching purpose of the preference provision to avoid a creditors'-rush to the bank to dismember a debtor as it slides into bankruptcy. *In re Independent Clearing House,* 77 B.R. at 870. Because such a transfer would be according to ordinary business terms as well as in the ordinary course of business, it would be defensible against a preference avoidance action.

In sum, we reject the rule of the Ninth Circuit that any transfers made in the course of a Ponzi scheme cannot be made in the ordinary course of business under § 547(c)(2). Transfers made to noninvestor-creditors, in the ordinary course of business and according to ordinary business terms, may be protected from preference avoidance under § 547(c)(2). Because the $50,000 transfer to the Heggland Trust was a transfer to an investor in a Ponzi scheme, however, that transfer was not made according to ordinary business terms and thus, cannot be defended under § 547(c)(2).

## CONCLUSION

The $50,000 transfer to the Heggland Trust was a preference under § 547(b) and did not occur in the ordinary course of business. Consequently, we **AFFIRM** the district court's affirmance of the bankruptcy court's decision permitting the Trustee to avoid the transfer to the Heggland Trust.