### In re UNIVERSAL FACTORING COMPANY, INC.;

### James Ray Eckhart;

### The James Dawson Eckhart and Sydne Marie Eckhart Irrevocable Trust Dated May 1, 1996, Debtors.

### Nos. 98–03383–M, 98–03807–M.

United States Bankruptcy Court, N.D. Oklahoma.

Aug. 22, 2005.

---

Sam G. Bratton II, Doerner, Saunders, Daniel & Anderson, LLP, Tulsa, OK, for the Debtor, Universal Factoring Co., Inc.

Sam G. Bratton II, Doerner, Saunders, Daniel & Anderson, LLP, Tulsa, OK, for the Applicant.

Patrick J. Malloy III, Malloy Law Firm, P.C., Tulsa, OK, Chapter 7 Trustee.

Paul R. Thomas, Tulsa, OK, for United States Trustee.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Chief Judge.

Over seventy years ago, the United States Supreme Court coined the maxim that bankruptcy exists for the benefit of "the honest but unfortunate debtor."[1]

What, then, are bankruptcy courts to do when the debtor is neither honest nor unfortunate? Should they stand as his sanctuary? Should the charlatan be given the same breathing spell and opportunity to reorganize as a debtor engaged in a legitimate business enterprise? These are interesting questions. The question before the Court today deals not with the malevolent debtor, but with its counsel. Specifically, should the efforts of counsel to reorganize a debtor whose principal business is the perpetration of a fraud be compensated at the expense of the victims of the fraud? This too is an interesting question, and one which appears to be the subject of little precedent. This case contains another twist: counsel who seeks to be compensated also sought to serve two masters. One of those masters has taken strong issue with counsel's request to be paid. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

### Jurisdiction

■ The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C.A. § 1334(b).[2] Reference to the Court of this contested matter is proper pursuant to 28 U.S.C.A. § 157(a). Issues relating to the allowance of fees are core proceedings as contemplated by 28 U.S.C.A. § 157(b)(2)(A).

### Burden of Proof

■ A professional seeking to be paid fees and expenses from a bankruptcy es-

---

1. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (citations omitted).

2. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2005). All other references to federal statutes and rules are also to West 2005 publications.

tate has the burden "to prove and establish the reasonableness of each dollar, each hour, above zero."[3] Several courts have noted that "[t]his burden is not to be taken lightly, especially given the fact that every dollar expended on fees results in a dollar less for distribution to creditors of the estate."[4] Similarly, an applicant is required to present its fee application in such a form as to make the tasks performed and the time spent readily apparent.[5] The substantive requirements for such an application are set forth in Bankruptcy Rule 2016(a).[6]

## Findings of Fact

Universal Factoring Company, Inc. ("Debtor" or "Universal") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on August 21, 1998. This filing marked the second filing for Universal in less than two days. On August 20, 1998, an involuntary Chapter 11 petition was filed against Universal by three of its creditors.[7] That case was dismissed after Universal filed its voluntary Chapter 11 petition.[8]

At the time it filed the voluntary petition, Universal filed an application to employ Sam G. Bratton II ("Bratton") and the law firm of Doerner, Saunders, Daniel & Anderson, LLP ("DSDA") as its counsel. As part of the application, Bratton and DSDA submitted an affidavit stating that they had no prior connection with the Debtor and did not hold or represent an interest adverse to the Debtor. On the basis of the affidavit, the Court authorized the retention of Bratton and DSDA. Notwithstanding the filing of the involuntary petition, Bratton stated that there was no cataclysmic event which influenced the timing of the filing, but that the case was simply filed when the documents necessary

3. *In re Polishuk,* 258 B.R. 238, 240 (Bankr. N.D.Okla.2001) (*citing In re Burke,* 147 B.R. 787, 798 (Bankr.N.D.Okla.1992) and *Mares v. Credit Bureau of Raton,* 801 F.2d 1197, 1210 (10th Cir.1986)).

4. *In re Mahaffey,* 247 B.R. 823, 825 (Bankr. D.Mont.2000) (and cases cited therein).

5. *Cf. In re Seneca Oil Co.,* 65 B.R. 902, 908 (Bankr.W.D.Okla.1986).

6. Federal Rule of Bankruptcy Procedure 2016(a) provides as follows:

> (a) **Application for Compensation or Reimbursement.** An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor, except that details of any agreement by the applicant for the sharing of compensation as a member or regular associate of a firm of lawyers or accountants shall not be required. The requirements of this subdivision shall apply to an application for compensation for services rendered by an attorney or accountant even though the application is filed by a creditor or other entity. Unless the case is a chapter 9 municipality case, the applicant shall transmit to the United States trustee a copy of the application.

Fed. Rule Bankr.P. 2016(a).

7. *See Case No. 98–03370–M, Universal Factoring, Inc., Debtor, Docket No. 1.*

8. *See id., Docket No. 7.*

for filing were ready to be filed.[9]

James D. Eckhart ("Eckhart") was the principal operating officer of Universal. In its schedules filed on September 8, 1998, Debtor listed assets of $2,660,577.33, and liabilities of $31,904,987.07. In the petition, Universal indicated that it was in the business of "debt collection." In the statement of financial affairs filed on September 8, 1998, the Debtor provided no information regarding its income in the two years prior to the filing of the bankruptcy case, indicating that such data was at that time "unavailable."[10] Similarly, none of the financial information routinely found in a Chapter 11 debtor's initial report was included in the report filed by Universal.[11] Thus, at the inception of the case, neither the Court nor the creditors were given a picture of Universal's business or its financial condition.

Though the description seemed generic at the time, it turned out that Universal was, in a manner of speaking, indeed engaged in the business of "debt collection." It was not debt collection in the traditional sense. The Oklahoma Department of Securities, after a thorough investigation, provided the Court with this description of Universal's business model:

> In the present case, the Department filed its civil lawsuit against a company that has perpetrated a massive fraud victimizing hundreds of investors through a "Ponzi scheme" utilizing promissory notes sold to investors allegedly to fund Universal Factoring's purchase of accounts receivable. The investor expected a substantial profit in the form of high interest payments from the investment in Universal Factoring. The promissory notes are securities. *See,* Section 2(v)(1), (v)(6) and (v)(11) of the Oklahoma Securities Act. Each investor was assured the money invested would be used to purchase accounts receivable; however, at the 341 Hearing in this matter, James Ray Eckhart ("Eckhart"), the controlling person of Universal Factoring, admitted that notes were sold to investors, and the proceeds were used to pay other investors. Universal Factoring has, after two years of conducting the "Ponzi scheme," reached the inevitable result of finding itself with 33 million dollars in debt primarily owed to investors, and only 2.7 million dollars in as yet unidentified and unverified accounts receivables.[12]

The description falls squarely within the description of a "Ponzi scheme."[13] Although his testimony was a bit confusing, the Court concludes that either initially or shortly after the case was filed, Bratton knew or should have known that the primary business of Universal was a Ponzi scheme.[14]

---

9. *Transcript of Proceedings held before the Honorable Terrence L. Michael on June 29, 2005, Docket No. 1145,* page 70, lines 18 through 25.

10. *DSDA Ex. 1.*

11. *See DSDA Ex. 2.*

12. *Trustee's Ex. 3,* p. 3–10.

13. The United States Court of Appeals for the Tenth Circuit has defined a "Ponzi scheme" as

> ... an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

*In re Hedged–Investments Assocs., Inc.,* 48 F.3d 470, 471 n. 2 (10th Cir.1995).

14. The Court finds the following testimony probative of Bratton's knowledge of the Universal business model:

> Q. Going back to the Department of Securities lawsuit, you—again you didn't ask to

On December 21, 1998, Universal filed its first disclosure statement and plan.[15] The documents were authored by DSDA and Bratton. The plan provided the credi-tors of Universal with two options. Universal would either "continue to operate its business with an emphasis on brokering of accounts," with Eckhart serving as presi-

look at any of the evidence that they had that could conceivably support the allegation that a Ponzi scheme had been conducted prior to bankruptcy?

A. [by Bratton] I—I'm not sure that I asked for any such evidence. I—they furnished me a ton of such evidence, I think, without asking.

Q. Did you look at it?

A. I looked at most of what they sent me, sure.

Q. You said—you looked at most of what they sent you?

A. Yeah. Well, they were—they were very cooperative, as I was with them, in exchanging information.

Q. Having said that and in having looked at most of the documents they sent you, did you conclude as a result of that that they were right, that he had engaged in a Ponzi scheme prior to bankruptcy?

A. Mr. Malloy, as I said, I'm—I make no excuses for the behavior of the debtor prepetition.

Q. Just—

A. I accept your characterization—

Q. I understand what you want to say, Mr. Bratton, I just want you to answer that question. Did you conclude one way or the other that he had conducted a Ponzi scheme? That's a pretty simple question. And—

A. Did I conclude—I—I became aware at some point in these proceedings that it was—I didn't—I don't make the decision. I don't—I don't, you know, decide what is or is not the legal effect of something. But the man was—not the man—the business was—was going on, raising money—

Q. No, I'm not asking you that either.

A. Do you want me to put a label on it—

Q. My question is: Did you conclude at some point in the Chapter 11 that the allegations of the Department of Securities that he had been involved in a Ponzi scheme or a fraudulent scheme of some kind prior to the commencement of the Chapter 11?

A. Did I conclude whether—I thought that—I thought that was well founded, personally. I don't know if I made a conclusion the same way you said. But I could—I

didn't disagree with anything—any of their findings.

Q. Okay. You, during the course of the 11, felt that those allegations were well founded?

A. I didn't see—yes, I didn't see anything they alleged in any of the facts and conclusions they furnished me that I thought were—were not well taken. I didn't—I didn't know that I—

Q. Did they provide you records that showed that in fact he—the debtor prior to bankruptcy was using new money to pay old investors?

A. I—I'm sure they did, yes. I wasn't—but that was no surprise to me.

Q. That wasn't a surprise to you?

A. No. It was—

Q. All right.

A. —it was no secret in this case at all.

*Transcript of Proceedings held before the Honorable Terrence L. Michael on June 29, 2005, Docket No. 1145*, page 55, line 10 through page 57, line 13. By his own admission, Bratton had little concern with the nature of Universal's pre-petition activities:

Q. But in any event you weren't conceding, were you, that two weeks after the filing a bankruptcy that the debtor had been involved in a Ponzi scheme, or were you?

A. [by Bratton] I didn't concede it. I didn't contest it. I wasn't—I wasn't concerned with it.

Q. Did you not care whether he had been involved in a Ponzi scheme prior to bankruptcy or not?

A. Well, certainly during that time what I was concerned about was formulating a plan within the reasonable amount of time to maximize the return to the creditors. I—you know, the debtor's—

Q. But you—

A. —mistakes, omissions prior to the bankruptcy case and the characterization of those were not high on my list of concerns. I didn't—

Q. Okay. So—

A. I didn't like it, but it was—it was just the—the hand that we're dealt.

*Id.*, page 48, lines 2 through 19.

**15.** *DSDA Exs. 5 & 6.*

dent and chief operating officer, or the business would be liquidated.[16] The fate of the business was to be left in the hands of its creditors, who would be allowed to vote for their preferred option. The first disclosure statement contained no information regarding the Debtor's financial operations. The only financial information was a liquidation analysis of the assets of the Debtor in either a Chapter 11 or Chapter 7 liquidation. The disclosure statement contained no information regarding Universal's past financial performance or its future financial projections.[17] On December 28, 1998, Universal filed an amended disclosure statement which contained additional financial information, but no information regarding the Debtor's past financial performance.[18]

Submission of this first plan and disclosure statement (and the amendments thereto) was met with little favor by Universal's creditors and interested parties. Objections to the disclosure statement were filed by Patrick J. Malloy III ("Malloy"), the trustee in Eckhart's Chapter 7 bankruptcy case; Stillwater National Bank & Trust; the Oklahoma Department of Securities; the Official Unsecured Creditors' Committee; Jay L. Richardson, M.D.; the Jay L. Richardson, M.D. PST # 1; Kurt L. Krueger, M.D.; and the Office of the United States Trustee. On February 2 and 16, 1999, the Court held hearings on the proposed disclosure statement and the objections thereto. At the February 2, 1999, hearing, counsel for Universal presented an amended disclosure statement, which had not previously been supplied to the objecting parties. At the conclusion of the February 16, 1999, hearing, the Court gave Universal and the objecting parties fourteen days to attempt to work out their differences. Supplemental objections to the proposed amended disclosure statement were filed by the Oklahoma Department of Securities and Stillwater National Bank & Trust. On March 2, 1999, Debtor sought and obtained an extension of time until March 8, 1999, to address the concerns raised by the various parties objecting to the disclosure statement.

On March 9, 1999, Debtor filed yet another amended disclosure statement,[19] and the Court considered the same and the various objections thereto. For the first time, this disclosure statement presented historical financial information for the Debtor, albeit unaudited.[20] The informa-

---

**16.** *DSDA Ex. 5*, pp. 1–2.

**17.** *See DSDA Ex. 6.* It should also be noted that, at the time this plan and disclosure statement was filed, Universal had generated absolutely no revenue since the filing of the bankruptcy case. *See DSDA Ex. 2* (no revenue in month prior to case filing); *see also Docket No. 62* (no revenue in months of August, September, and October of 1998); *Docket No. 71* (no revenue in November 1998); *Docket No. 78* (no revenue in December 1998).

**18.** *DSDA Ex. 7.*

**19.** *DSDA Ex. 14.*

**20.** The disclosure statement as amended on March 9, 1999, also contains the following information regarding the pre-petition operations of the Debtor:

> UFC operates as a financial services company specializing in the factoring of account receivables and purchase orders. In addition, UFC occasionally rendered consulting services, and acted as a broker of accounts receivable and venture capital. The terms of Debtor's factoring contracts, its principal business, varied according to the particular transaction, with its factoring fees varying between 2% per month up to 20% for ten days. Occasionally, UFC would take an equity position in its account customers, but any such transactions were very small and were done to facilitate a factoring arrangement. Debtor estimates that it paid no more than $100 for all of the equity interests it purchased during its existence.

tion showed the Debtor had suffered millions of dollars in losses in the years prior to the filing of the case.

On March 22, 1999, the Court entered its order denying approval of the first disclosure statement, as amended. In a strongly worded opinion, the Court found that the disclosure statement failed to contain adequate information as required under § 1125(a) of the Bankruptcy Code.[21] The Court further found that much of the information contained in the disclosure statement supported the conclusion of the Oklahoma Department of Securities that Universal and Eckhart had engaged in a Ponzi scheme.[22] The Court bluntly advised all of the parties that "[i]f the Debtor has been engaged in a Ponzi scheme, this Court has little interest in being a conduit of its reorganization." [23]

The dispute over the disclosure statement was not the only front on which Universal was waging battle. On January 21, 1999, the Unsecured Creditors' Committee filed a motion seeking the appointment of a Chapter 11 Trustee, which would effectively remove Eckhart from control of Universal. On February 8, 1999, Malloy, in his capacity as trustee in Eckhart's Chapter 7 case, filed a motion for substantive consolidation, seeking to combine the bankruptcy estates of Eckhart and Universal. These matters percolated along, as contested matters will, and, on June 22, 1999, Malloy, Eckhart, Universal, and the Unsecured Creditors' Committee filed a motion to approve a compromise of these motions (the "Compromise").[24] Under the terms of the Compromise:

1.  The cases of Eckhart and Universal would be substantively consolidated;

2.  Substantive consolidation would be without prejudice to Eckhart's right to seek to convert his individual case to a case under Chapter 13 of the Bankruptcy Code;

3.  The consolidated case would not be converted to a case under Chapter 7 for a period of 120 days, with certain possible exceptions;

4.  Universal and Eckhart would retain standing to propose a plan of reorganization in the substantively consolidated case;

5.  Bratton and DSDA would "continue as special counsel for the Trustee [Malloy], compensible [sic] under §§ 327, 330 and 331 of the Bankruptcy Code, for the purpose of proposing and obtaining confirmation of a plan of reorganization, for implementing this settlement, and for any additional tasks assigned by the Trustee";

6.  Woodrum, Wilson, Kemendo & Cuite, the accountants for Universal, would continue to serve as special accountants for the Trustee.

Objections to the Compromise were lodged by the United States Trustee and Stillwater National Bank.

---

*DSDA Ex. 14,* pp. 2–3.

21.  *See Trustee's Ex. 8.*

22.  As the Court stated:

According to the Disclosure Statement, the funds which Debtor received from investors were "accruing interest at rates between 1—12% [sic] per month [18% per year] to 10% per week [520% per year]." *Disclosure Statement, p. 4.* In addition, one of the exhibits to the Disclosure Statement suggests that Debtor was using proceeds from new "loans" to pay principal and interest due and owing on older "loans." *See Disclosure Statement, Exhibit "D."* Each of these items are indicia of a "Ponzi scheme."

*Id.,* p. 8–5 n. 4.

23.  *Id.,* p. 8–5.

24.  *DSDA Ex. 15.*

On July 27, 1999, the Court held an evidentiary hearing on approval of the Compromise. Two days later, in a detailed ruling read from the bench, the Court approved the Compromise. As it did so, the Court noted that, in effect, Malloy and the Unsecured Creditor's Committee were providing Universal and Eckhart a relatively small amount of time (120 days) in exchange for winning the relief that they had sought in the Motions for Substantive Consolidation and for the Appointment of a Trustee. The Court found this to be an eminently reasonable resolution of the issues raised by the motions for substantive consolidation and to appoint a trustee. With respect to the proposed employment of Bratton and DSDA by Malloy, the Court expressed no independent concern with the proposed retention, provided that Bratton and DSDA qualified under the requirements set forth in § 327 of the Bankruptcy Code.

On August 16, 1999, the order approving the Compromise was entered. Malloy filed an application to employ DSDA and Bratton as special counsel.[25] The application contained the following statement:

> COMES NOW Patrick J. Malloy III, Trustee in the above case ("Trustee"), and requests the Court enter an Order authorizing the Trustee's retention of Doerner, Saunders, Daniel & Anderson, L.L.P. ("DSDA") and Sam G. Bratton II ("SGB") as special counsel for the Trustee. As grounds therefor, Trustee would show the Court that pursuant to a settlement and compromise recently approved by the Court, the above *Debtors* retained standing to propose a plan of reorganization in the consolidated Chapter 11 case and the *Debtors* desire to continue to utilize the services of DSDA and SGB for that purpose. DSDA and SGB are well qualified to represent the *Trustee* herein to perform the professional services contemplated by the settlement and compromise. The Trustee may, from time to time, assign other specific tasks to DSDA.[26]

Although it is commonplace for applications to employ counsel to be ruled upon *ex parte*, the Court set this application for hearing. The reasons become clear when one reviews the following portions of the transcript of the hearing upon the application:

> THE COURT: Thank you.
>
> Let us then move for the application to employ special counsel. The reason I set this for hearing is I'm curious on the face of the application, and that this applies to both the application for counsel and accountants. This language appears "As grounds, therefore, trustee would show the Court that pursuant to a settlement and compromise recently approved by the Court, the above debtors retain standing to propose a plan of reorganization in the Chapter 11 case. And the debtors desire to" consider to— "continue to utilize the services of Doerner, Sanders, Daniel and Anderson; and Samuel G. Bratton for that purpose."
>
> I've never seen a situation where a trustee seeks approval to employ an attorney to work for someone else.
>
> So, Mr. Malloy, I guess it's your application. Perhaps you can speak to that.

---

25. *DSDA Ex. 20.* The timing here can be a bit confusing. Malloy was not appointed to serve as trustee in the consolidated cases of Universal and Eckhart until September 7, 1999, well after he filed the application to employ Bratton and DSDA. None of the parties have ever made an issue of this fact, and it has no effect upon the decision which the Court makes today.

26. *Id.* (emphasis added).

MR. MALLOY: Yes, Your Honor. I think that, first of all, I did not draft the motion. But I think the intent was for the trustee to employ special counsel to proceed with a plan which under the settlement agreement is contemplated. *I do think that it is the trustee's application, therefore counsel and the accountant will be working for the trustee.* And it could be that we have a problem with the language in the proposed order. But I mean actually the employment of special counsel was something that was addressed in the settlement agreement. And I may defer to Mr. Bratton.

The truth is the debtor even with the appointment of a trustee can proceed with it, with a plan without the employment of special counsel. But if what Mr. Bratton wants to do to is proceed as special counsel to the trustee, then that's—he's going to be doing this on behalf of the trustee.

I'm not sure I'm helping you very much. But we're trying to be consistent here with what we all agreed to in the settlement agreement.

THE COURT: So, Mr. Bratton, who's going to be your master from here on out?

MR. BRATTON: *Your Honor, there shouldn't be any doubt but that the special counsel and the accountants will be employed by the trustee and will be serving at the pleasure of the trustee.* I think that in the—if the application is inartfully worded, that is— that is my responsibility. It was kind of—it was meant to convey the concept that it was the debtor's desire in connection with the settlement agreement that the debtor be able to continue to formulate a plan recognizing, of course, that the debtor's status is going to change considerably, or has changed consider-

ably by virtue of the appointment of the trustee. But I think the proposed order submitted to the Court makes it clear that the accountants and the special counsel are employed solely by the trustee.

\*       \*       \*       \*       \*       \*

THE COURT: ... Mr. Bratton, anything further? I guess I will tell you I'm still just struggling a little bit, given the representation of past management of the debtor, but it strikes me that the interests of past management of the debtor and the interests of the trustee may not be on the same page. But I'm—it seems to me at least at this stage unless that—the issue of a conflict is brought to the attention of the Court, I'm not sure that's anything that I should be addressing independently. But that is something that stuck in my mind especially with the drafting of applications indicating the debtor's desire to utilize the services of your firm and Mr. Kemendo's firm for the purpose of proposing a plan. That's what triggered this being set. And that's what's triggered the inquiry to the Court.

MR. BRATTON: Probably also, Your Honor, at the time that the applications were drafted there really wasn't a trustee. And it would—I suppose it would be a little presumptive to say the trustee presumed or didn't presume. If that could've been done, and I suppose had— had things not attempted did [sic] to be compressed to all into one-stop shopping, the trustee would have been appointed. *And then the trustee would have filed an application representing that this was implementing a settlement agreement and he desired to retain counsel to go forth and draft a plan, et cetera. That is the intention.* But at this point in time what Mr. Tomlins says is what I have said before.

*And that is that the professionals will be working for Mr. Malloy and serving at his pleasure.* And there's some wrinkles to iron out in the plan. Who is the plan proponent being one of those things. And that's next week's problem. But I think as far as retention is concerned, it's consistent with what we've agreed on. And we're going to go forth and do the things we said we would do in the application. And then we'll file a request for compensation and take up any problems at that time.

THE COURT: All right. *But from this day forward you will be in this case employed as Mr. Malloy's attorney; is that correct? Do I understand that correctly?*

MR. BRATTON: *That is correct, Your Honor.*[27]

The order approving the employment of Bratton and DSDA as special counsel was entered on September 7, 1999.[28]

On December 22, 1999, Malloy filed a motion to convert the Universal/Eckhart case from Chapter 11 to Chapter 7 ("Motion to Convert").[29] The motion was drafted and filed by Malloy personally; neither Bratton nor any other attorney from DSDA signed the Motion to Convert. In the Motion to Convert, Malloy noted that the Debtor had failed to file monthly operating reports, that the forbearance period set out in the Compromise had expired without the filing of a plan or disclosure statement, and that he did not believe it was possible to propose a feasible plan. A hearing on the Motion to Convert was scheduled for February 8, 2000.

Notwithstanding Malloy's stated position that reorganization was not feasible, Bratton, on January 11, 2000, filed pleadings entitled "Second Amended Plan of Reorganization" and "Disclosure Statement for the Second Amended Plan of Reorganization."[30] Each of these pleadings was signed by Eckhart in his capacity as president of Universal. In addition, although no signature appears, Bratton and DSDA placed their names upon these documents, and identified themselves as "Special Counsel for the Trustee." The Court set the Disclosure Statement for the Second Amended Plan for hearing on February 22, 2000, at a time after the hearing on the Motion to Convert. On January 19, 2000, Bratton and DSDA filed pleadings entitled "Third Amended Plan of Reorganization" and "Disclosure Statement for Third Amended Plan of Reorganization."[31] Once again, these documents were signed by Eckhart, and listed Bratton and DSDA as "Special Counsel for the Trustee."

The Second Amended Plan and the Third Amended Plan were similar in structure to the original plan filed by Universal. Each plan provided creditors with the opportunity to vote for one of two options: continuation of the business or its liquidation. The main difference between the original plan and these plans was that both the Second Amended Plan and the Third Amended Plan called for the infusion of money into the Debtor. The Second Amended Plan called for the infusion of $700,000, while the amount was doubled in the Third Amended Plan to $1,400,000. This money, which was to come from individuals who had been involved with Uni-

---

27. *Transcript of Proceedings held before the Honorable Terrence L. Michael on September 7, 1999, Docket No. 1138,* page 4, line 6 through page 6, line 3 and page 9, line 13 through page 10, line 25 (emphasis added).

28. *DSDA Ex. 21.*

29. *DSDA Ex. 22.*

30. *DSDA Exs. 23 & 24.*

31. *DSDA Exs. 26 & 27.*

versal prior to the filing of the bankruptcy case, was to be used "to bring the Company out of bankruptcy and for start up capital." [32] Although these individuals assured Bratton that they had the ability to provide these sums to the Debtor if the Third Amended Plan were confirmed, Bratton never heard or saw anything but promises. In his own words, Bratton "never saw the color of their money." [33] The disclosure statements for the Second Amended Plan and the Third Amended Plan contained projections which, to put it mildly, reflected an unbridled optimism.[34]

Thus, while the client (Malloy) was advocating Universal's conversion to Chapter 7, the lawyer (Bratton) was advocating its reorganization with Eckhart at the helm. One need not be a scholar in legal ethics to appreciate the predicament in which the parties found themselves at this point. In an effort to address the problem, Malloy and Bratton filed a "Request for an Expedited Pre-Hearing Conference," in which they stated their "desire to confer with the Court regarding the procedures to be followed respecting the hearing on the Motion to Convert and particularly representation of the corporate debtor and the role of DSDA respecting that hearing." [35] The hearing was held as requested on February 4, 2000. Bratton, upon direct questioning by the Court, admitted that the Second and Third Amended Plans and disclosure statements had been "sponsored by the debtor," Universal.[36] Bratton also took the position that such representation of Universal was consistent with the representations which he made on September 7, 1999, that he and DSDA would no longer represent Universal, but would act solely as counsel for Malloy.[37] At the hearing,

32. *DSDA Ex. 27*, p. 9.

33. *Transcript of Proceedings held before the Honorable Terrence L. Michael on June 29, 2005, Docket No. 1145*, page 60, lines 13 & 14 (testimony of Bratton).

34. The disclosure statement which accompanied the Second Amended Plan contained no financial projections. *See DSDA Ex. 24.* (The Court has independently confirmed that no such projections were attached to this disclosure statement when it was originally filed. *See Docket No. 202.*) The financial projections attached to the disclosure statement for the Third Amended Plan projected a meteoric rise in net income for the reorganized Universal:

| Year After Confirmation | Projected Net Income |
| --- | --- |
| Year One | $ 106,271 |
| Year Two | $1,380,941 |
| Year Three | $1,829,689 |
| Year Four | $3,807,903 |
| Year Five | $6,313,137 |

*DSDA Ex. 27*, Exhibit "G" thereto. All this from a company which never made more than $32,038 in the five years prior to seeking bankruptcy protection. *Id.,* Exhibit "B" thereto. The projections attached to this disclosure statement are limited by the same form of disclaimers which the Court disapproved of in its opinion on the first disclosure statement. To the extent Bratton and DSDA contend that the Second and Third Amended Plans constituted viable alternatives to liquidation, the Court, upon the evidence before it, disagrees.

35. *Docket No. 212.*

36. *Transcript of Proceedings held before the Honorable Terrence L. Michael on February 4, 2000, Docket No. 1146*, page 10, lines 14 through 18.

37. Consider the following statements made at the February 4, 2000, hearing:

[MR. BRATTON]: My sole role—my sole purpose in obtaining the title or the designation, if you will, by the—as special counsel to the Trustee was to allow me to continue to operate as an officer of this bankruptcy case for the limited purpose of bringing a plan sponsored by the debtor before the Court.

THE COURT: How is that—Mr. Bratton, how is that consistent with the statements that were made on September 7th that you be working for the Trustee from that point forward?

MR. BRATTON: I don't—oh, I don't see any inconsistency in that at all, Your Hon-

the guidance of the Court was solicited on the issue of whether Bratton and/or DSDA could appear on behalf of Universal in opposition to the Motion to Convert. The Court was not required to answer this question, as Malloy unequivocally stated his refusal to consent to such actions by Bratton or DSDA. It was at that hearing that the Court learned that Malloy did not support the efforts of Bratton and DSDA in the drafting of the Second and Third Amended Plans and disclosure statements. At that hearing, the Court reminded all of the parties of its unwillingness to confirm a plan of reorganization for a debtor whose primary business was the operation of a Ponzi scheme.

On February 8, 2000, the Court held the hearing on the Motion to Convert. Universal's life as a Chapter 11 debtor ended with a whimper instead of a bang. No one appeared for either Eckhart or Universal. No one opposed conversion. Bratton appeared in his capacity as special counsel for Malloy and stated that he had no objection to conversion. The Court made its findings of fact based upon matters found of record in the court file and concluded as a matter of law that the case should be converted to Chapter 7. The entire process took less than twenty minutes. After the case was converted to Chapter 7, Malloy was appointed to serve as Chapter 7 Trustee. Bratton and DSDA remained in the employ of Malloy and later assisted him in the prosecution of various actions to recover monies for the benefit of the estate.

Much of the work performed by Bratton and DSDA after the conversion to Chapter 7 related to the collection of monies paid

> or. I'm—I mean, I'm working for the Trustee. And our agreement, the agreement—the settlement agreement between the debtor and the Trustee is for that to happen. And so it's for—it's for me as special counsel for the Trustee to present this plan. As I say, it—it's a hybrid. It's not—it's not—I wasn't hired to bring a trustee's plan because a trustee is—can't have—doesn't have a plan, or is not—I mean, it's not his business, so to speak.
>
> But that was the idea behind the settlement that was crafted was to put the Trustee in place, to—to freeze everything in place, but allow the debtor to go forth and propose this plan. And I—I expect, Judge, if you got a tran—the full transcript of that hearing you will see in there some discussion about whether or not I should just continue as counsel for the debtor.
>
> And I can't really recall how it evolved as being special counsel for the Trustee, but I—I don't think that was—I don't think that that designation, if you will, altered or was intended to affect the fact that the debtor, using my services, was going to go ahead and propose a plan.
>
> And, you know, we just found ourselves in this position because we just—we kind of crafted a unique solution to allow both of those—that the existence of a Trustee and the debtor's shot at a plan to go forth. But
>
> I really don't—I don't see any inconsistency in there.
>
> And I—I suppose that the Trustee could fire me, as I say—as I say in there. And as—as the—as the debtor or the Trustee always can do to its counsel. That just wasn't the deal.
>
> And what I suggest, my suggested solution would be to allow me to just to go forth and state the position of the debtor on these issues and raise the defenses and motions that the debtor ought to be doing.
>
> THE COURT: So you represent—you'd want to represent the debtor, not—
>
> MR. BRATTON: Well, I just—
>
> THE COURT: —notwithstanding what you told me in September? You want to represent the debtor?
>
> MR. BRATTON: No, sir. I—this is—this is—Judge, this is exactly why I initiated the request, with Mr. Malloy's concurrence and joinder, to have this conference.
>
> I am not going to do that if the Court feels that that is in any way contrary to what I represented before. If the Trustee consents to my going forth, I don't—I don't see that being inconsistent at all with the representations that were made to the Court, because I would be doing it within the authority and auspices of the limited and specialized appointment that I got.
>
> *Id.* page 10, line 14 though page 12, line 20.

by Universal to "investors" prior to the filing of the case. Malloy sought to recover these funds on the basis that they were fraudulent transfers. On several occasions, Bratton filed the initial complaint on Malloy's behalf. In doing so, Bratton filed pleadings which condemned Universal and its management in no uncertain terms, as can be seen from the following example:

> The Debtor corporation, Universal Factoring Co., Inc. ("Universal"), was allegedly engaged in the business of factoring receivables. The principal of Universal, the individual debtor James Ray Eckhart ("Eckhart"), directly and indirectly solicited substantial sums of money from various individuals and corporate investors for use in the factoring business. Upon information and belief, Universal conducted little or no factoring business, and during the period of one year prior to the petition date of Universal, Universal had no legitimate business purpose. Universal utilized new investment monies to repay old investment obligations. The process of utilizing new money to pay old obligations was fraudulent as to investors.[38]

Over one hundred such adversary proceedings were filed, all containing the same or similar allegations. In many of the adversary proceedings, Bratton and/or DSDA acted as lead counsel.

From the time of conversion to Chapter 7 until June 6, 2005, Malloy collected $1,678,425.50 in funds for the benefit of the estate.[39] Out of this sum, DSDA has been paid the total sum of $143,654.80 for its services rendered in assistance to Malloy in collecting estate assets.[40] This sum represents payment for services rendered after the conversion of the case to Chapter 7. Neither Malloy nor any other party objected to the payment of these fees.

On June 14, 2005, DSDA filed its "First and Final Application for Allowance of Fees and Reimbursement of Expenses by Doerner, Saunders, Daniel & Anderson, L.L.P. Counsel for Debtor" (the "Application").[41] In the Application, DSDA seeks an award of fees and expenses in the amount of $89,000 for services which it rendered *to Universal as debtor and debtor in possession.* The services were performed between August 21, 1998 (the date the Chapter 11 voluntary petition was filed), through April 4, 2000.[42] A significant portion of the services were performed after September 7, 1999, the date Bratton unequivocally informed the Court that he and DSDA were no longer working for the Debtor. In the Application, DSDA separates the services which it performed into the following categories: case administration, communications with creditors and creditors committee, plan, securities matters, and business operations. DSDA seeks to be compensated for all of its time at the hourly rates which it currently charges, rather than the rates in effect at the time services were performed.[43] It

---

38. *Adv. Proc. No. 01–0128–M, Patrick J. Malloy III, Trustee, Plaintiff, v. Commercial Management Group, Inc., Defendant, Docket No. 1,* ¶ 2.

39. *Docket No. 1067.*

40. *Id.* (includes attorney fees and expenses).

41. *Docket No. 1110.*

42. Notwithstanding the fact that the Application lists no time entries for services per-

formed prior to August 21, 1998, the date the case was filed, DSDA seeks reimbursement for a "mileage charge" of $5.67 incurred on August 6, 1998. *Application, Docket No. 1110,* Time and Expense Detail attached thereto, page 23. The discrepancy is a bit puzzling.

43. The Application only contains the current hourly rates of the various DSDA professionals who performed services set out in the Application. At the request of the Court,

also claims that those services (including expenses) have a value in excess of $106,000, and that the fees sought are discounted "[a]s an accommodation to the Trustee, and in consideration of the overall circumstances of the case[.]" [44] Notice of the Application was given to all creditors and parties in interest.

Objections to the Application were filed by Malloy and the United States Trustee (the "UST"). Both parties took issue with the benefit to the estate from the services set out in the Application. Malloy takes the position that none of the services outlined in the Application conferred a benefit to the estate, and that, as a result, none are compensable. Malloy also argues that the placement of a Ponzi scheme in a Chapter 11 bankruptcy case for the purpose of reorganization was improper *per se*, and that absolutely no fees should be awarded. He points to the fact that DSDA knew or should have known of the fraudulent nature of Universal's business from the inception of the case, and that no reasonable attorney would, under those circumstances, advance a reorganization plan. The UST echos the position taken by Malloy, and also argues that several of the time entries are so vague as to preclude compensation. The UST seeks some manner of accounting of monies previously paid by Universal to DSDA, and argues that there is no justification for compensating DSDA for work performed several years ago at current hourly rates.

An evidentiary hearing on the Application and the objections was held on June 29, 2005. The Court heard testimony from two witnesses: Bratton and Malloy. Bratton testified to his belief that the Compromise, and its approval by the Court, constituted some form of mandate for Bratton and DSDA to file the Second and Third Amended Plans and disclosure statements:

> [Bratton:] Exhibit 20 is the trustee's application to employ Doerner as special counsel. Wherein in the introductory paragraph thereof, the trustee refers to the order to the settlement and compromise recently approved by the Court, and requests authority to retain Doerner Saunders and Sam Bratton for that purpose. And on September 7th of 1999 the Court entered an order authorizing the retention.
>
> So, thereafter, the status of Doerner Saunders was as special counsel for the trustee, with the Court having found it would be in the best interests of the creditors for the debtor to attempt to formulate a plan pursuant to a joint settlement agreement approved by the trustee and the committee with notice to all the creditors in the case without objection. Doerner did just that, worked with the debtor and other parties-in-interest, consulted with the committee—or creditor representatives at that point in time, there being a Chapter 11 trustee.
>
> And the result of those negotiations culminated in a second amended plan of reorganization being filed by the debtor

DSDA filed a statement of the hourly rates in effect at the time services were performed, which contains the following information:

| Professional | 1999 Hourly Rate | 2005 Hourly Rate |
| --- | --- | --- |
| Sam G. Bratton II | $200.00 | $250.00 |
| Robert A. Burk | $135.00 | $135.00 |
| James C. Milton | $135.00 | $210.00 |
| Leonard I. Pataki | $170.00 | $235.00 |
| Lynda Riker | $ 50.00 | $ 50.00 |
| L. Cole Cooper | $120.00 | $120.00 |

*See Docket No. 1140.* Professionals Burk, Riker, and Cooper are no longer employed at DSDA; the rates set forth in the Application are their 1999 rates.

**44.** *Id.,* ¶ 16.

on January 11th, 2000. That's found at Exhibit 23, Doerner's Exhibit 23.[45]

Malloy and the UST take issue with such a characterization of the settlement. Both take the position that the Compromise was not an endorsement of any efforts by Universal, Eckhart, Bratton, and/or DSDA to file a plan, but merely provided an opportunity for Universal to propose such a plan within a relatively short time frame. Such an opportunity was, in their eyes, a small price to pay for obtaining the appointment of a Chapter 11 Trustee and substantive consolidation of the two bankruptcy cases without further litigation.

Bratton also testified that there was a "core business" of legitimate factoring at Universal, that the business had "a five- or six-year track record of being profitable,"[46] and that the existence of this core business was a significant consideration in the placement of Universal into a Chapter 11 case. These statements are not supported by the record. The information contained in the first disclosure statement shows, at most, that Universal arguably had one "profitable" year in the five or six years prior to the filing of the case.[47] Moreover, the schedules, statement of affairs, and the initial report filed by Universal contain no information regarding its pre-petition financial performance. In response to the question requiring disclosure of the Debtor's income from operations during the two years prior to the filing of the case, the schedules and statement of affairs indicate that such information is "unavailable" and "will be provided at [the] earliest opportunity."[48] The initial report contains no information on the Debtor's income other than a statement that the Debtor earned no income in the 30–day period prior to the filing of the bankruptcy case.[49] Furthermore, it was not until March 9, 1999, that Universal submitted a disclosure statement with any meaningful financial information; the information provided painted a very bleak picture of Universal and its future. There is little evidence to support Bratton's contention that Universal had a viable core business and even less evidence to support his position that he and DSDA were aware of the viable core business at the time the case was filed.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Conclusions of Law

■ Malloy and the UST oppose the allowance of any of the fees sought by Bratton and DSDA in the Application. They contend that the services provided by Bratton and DSDA did not benefit the bankruptcy estate of Universal. More-

---

45. *Transcript of Proceedings held before the Honorable Terrence L. Michael on June 29, 2005, Docket No. 1145,* page 26, lines 6 through 25 (testimony of Bratton).

46. *Id.,* page 50, lines 2–4.

47. As the Court noted in its opinion denying approval of the first disclosure statement:

The operating history of the Debtor provides little if any support for the quixotic income projections contained in the Disclosure Statement. Debtor has generated the following net income since 1992:

| Year | Net Income |
|------|------------|
| 1992 | ($ 21,433.00) |
| 1993 | ($ 338,284.00) |
| 1994 | ($ 59,051.00) |
| 1995 | $ 32,038.00 |
| 1996 | ($ 1,901,532.00) |
| 1997 | ($13,331,314.00) |
| 1998 | ($13,631,044.00) |

*See Disclosure Statement, Exhibit B.* Trustee's Ex. 8, pp. 8–6 to 8–7.

48. *DSDA Ex. 1,* Statement of Financial Affairs, p. 72.

49. *DSDA Ex. 2,* p. 4.

over, they contend that counsel should not be compensated for efforts to reorganize a business based in fraud, with no legitimate business operations. In addition to these issues, the Court has to deal with the fact that Bratton and DSDA, after expressly stating to the Court that they were in the service of Malloy and having their employment approved on the basis of that representation, seek compensation for services that were performed at the direction of Universal and opposed by Malloy. The last issue is in many ways the most troubling, given the essential nature of full and complete disclosure required of counsel who choose to represent debtors and trustees in bankruptcy cases.

*Benefit to the Estate*

█ The standards for compensation of professionals are found in § 330 of the Bankruptcy Code.[50] The Court of Appeals for the Tenth Circuit has held that a threshold element of whether the services were "necessary" is whether they benefitted the bankruptcy estate.[51] Subsequent to the *Lederman* decision, § 330(a)(4)(A) was added to clarify that a bankruptcy court shall not compensate attorneys for 1) unnecessary duplication of services; 2) services which are not reasonably likely to benefit the debtor's estate; or 3) services that were not necessary to the administration of the case.[52] Unless the court deter-

50. Section 330 provides that
(a) (1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—
(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and
(B) reimbursement for actual, necessary expenses.
(2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.
(3)(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
(A) the time spent on such services;
(B) the rates charged for such services;
(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, impor-

tance, and nature of the problem, issue, or task addressed; and
(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
(4) (A) Except as provided in subparagraph (B), the court shall not allow compensation for—
(i) unnecessary duplication of services; or
(ii) services that were not—
(I) reasonably likely to benefit the debtor's estate; or
(II) necessary to the administration of the case.
§ 330.

51. *Rubner & Kutner, P.C. v. U.S. Trustee (In re Lederman Enters., Inc.)*, 997 F.2d 1321, 1323 (10th Cir.1993); *In re Pappas & Rose, P.C.*, 229 B.R. 815, 819 (W.D.Okla.1998) ("Necessary services are those that service and benefit the debtor's estate."); *In re Kusler*, 224 B.R. 180, 187 (Bankr.N.D.Okla.1998); *In re Reconversion Techs., Inc.*, 216 B.R. 46, 52 (Bankr.N.D.Okla.1997).

52. 11 U.S.C. § 330(a)(4)(A)(i)-(ii). *See In re Angelika Films 57th Inc.*, 227 B.R. 29, 41 (Bankr.S.D.N.Y.1998); *In re Delta Petroleum (P.R.), Ltd.*, 193 B.R. 99, 108 (D.P.R.1996).

mines that a service was reasonably likely to confer a benefit upon the estate, the inquiry goes no further, and the fees are not compensable.[53] This Court has previously defined what it means for services to have provided a benefit to the estate:

> The Bankruptcy Code defines "benefit" as whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title. § 330(a)(3)(C). Courts which have interpreted this statute have noted that courts are to consider the necessity of the services at the time they were rendered, not at the time the court reviews the application. *See In re City Mattress, Inc.*, 174 B.R. 23, 26 (Bankr. W.D.N.Y.1994) ("The key issue is whether the services were necessary, not whether the debtor's activities were, in hindsight, necessary to achieve whatever outcome eventually occurs."). In order to benefit the estate, the services rendered must relate to a realistically obtainable goal. Counsel for a debtor or debtor in possession will not be compensated for time spent in preparation of a plan which has no realistic hope of confirmation. *See Rubner & Kutner, P.C. v. U.S. Trustee (In re Lederman Enterprises, Inc.)*, 997 F.2d 1321, 1324 (10th Cir.1993) (where inability of debtor to propose plan "should have been apparent to counsel from the commencement of the case," no compensation awarded); *accord, Keate v. Miller (In re Kohl)*, 95 F.3d 713, 714–715 (8th Cir.1996); *see also In re Saturley*, 131 B.R. 509, 521 (Bankr.D.Me.1991) ("... futile efforts aimed at achieving unattainable objectives are unreasonable. Fees generated in tilting at windmills will be disallowed.") (citations omitted).[54]

Although *Polishuk* was in many ways factually dissimilar to the case at bar, the Court sees no reason to depart from this legal standard of what constitutes a benefit to the estate.

The vast majority of the time set out in the Application relates to the drafting of plans and disclosure statements. None of the plans prepared by DSDA was ever considered for confirmation. None of the disclosure statements prepared by DSDA was ever approved. Only one of the disclosure statements was presented to the Court for approval. That disclosure statement was rejected as being woefully inadequate and because the plan which it described was not confirmable as a matter of law. Moreover, Universal and its counsel were told in no uncertain terms that the Court would have no part of the attempted reorganization of a Ponzi scheme. Given these defects and this admonition, the Court cannot find that the preparation of the first plan and disclosure statement conferred a benefit upon the bankruptcy estate of Universal.

■ Bratton argues that the plans and disclosure statements prepared by DSDA after their employment by Malloy conferred a benefit upon the estate because, if they had been considered and confirmed, they could have provided for the successful reorganization of Universal. The Court rejects this argument for several reasons. The Second and Third Amended Plans and disclosure statements were premised upon the infusion of capital from various "white knights." Bratton admitted that, other than informing these people that they needed to have the money available at the time, he undertook no due diligence to determine that they had the ability to pro-

---

**53.** *See Reconversion*, 216 B.R. at 52.

**54.** *In re Polishuk*, 258 B.R. 238, 248–49 (Bankr.N.D.Okla.2001).

vide the funds they had promised. In his words, Bratton "never saw the color of their money." [55] These plans and disclosure statements were based upon projections of future income that would strain the credulity of even the most optimistic human being. Moreover, the reorganization plans were premised upon Universal getting out of the Ponzi business and into the "legitimate factoring business." If Universal was ever in the "legitimate factoring business," that chapter had been closed long before Universal ever found its way to the halls of bankruptcy. A Chapter 11 bankruptcy case is a legitimate tool for business rehabilitation, *not* business incubation. These plans were prepared at a time when everyone, including Bratton and DSDA, was well aware that the core business of Universal was the perpetuation of a fraud. Quite simply, there was no viable business to reorganize, and Bratton and DSDA knew or should have known it.[56] Finally, these plans and disclosure statements were abandoned when Malloy sought conversion of the bankruptcy case to Chapter 7.

Under these circumstances, the Court cannot find that efforts aimed toward the reorganization of Universal conferred a benefit upon the bankruptcy estate. The issue of benefit to the estate of services provided by DSDA and Bratton prior to their appointment as special counsel to the Trustee will be discussed later in this opinion, as the Court considers the argument of Malloy and the UST that the Application should be denied in its entirety because the case should never have been filed as a Chapter 11 case.

*Services Performed After September 7, 1999*

█ There is yet another issue with the services performed by DSDA and Bratton with respect to the Second and Third Amended Plans and disclosure statements. On September 7, 1999, this Court entered an order authorizing DSDA and Bratton to act as special counsel for Malloy. The retention was authorized only after a hearing was held in which Bratton assured the Court, in response to a direct inquiry, that Bratton and DSDA would not attempt to serve two masters in the case, but would, from that moment on, be in the service of Malloy. The record reflects that, after September 7, 1999, DSDA continued its efforts to prepare a disclosure statement and plan which was the brainchild of Universal and its former chief operating officer, Eckhart. The time records submitted by DSDA establish that DSDA spent little time discussing the terms of these potential plans with Malloy (their client); instead, their time was spent in discussions with Eckhart, the accountants hired on behalf of Universal, and creditors of the bankruptcy estate. There is nothing in the record to suggest that Malloy was an active participant in the plan development process after September

---

55. *Transcript of Proceedings held before the Honorable Terrence L. Michael on June 29, 2005, Docket No. 1145,* page 60, lines 13 and 14 (testimony of Bratton).

56. See *In re Muir Training Techs., Inc.,* 120 B.R. 154 (Bankr.S.D.Cal.1990), where the court, in analyzing the benefit of the attorney's efforts to the estate under § 330, found "[t]here simply was no evidence revealing any reasonable prospect of reorganization during the extension period.... Moreover, the applicant failed to timely convert the case to Chap-

ter 7. This court believes that it should have been obvious to the applicant that for some time prior to conversion that Muir would not be able to successfully reorganize.... Because applicant failed to timely convert the case when it was clear that there was no hope of reorganization and the estate suffered substantially from this failure, this court believes the other administrative claimants are more worthy of the remaining assets." *Id.* at 162–63.

7, 1999, or that he supported the reorganization efforts in any way. The fact that Malloy sought conversion of the case to Chapter 7 speaks to the contrary.

This Court has previously ruled that

Counsel for a debtor "has an affirmative duty to disclose *all* its connections with the debtor, including fees paid in the year preceding the bankruptcy filing." *See In re Saturley*, 131 B.R. 509, 516 (Bankr.D.Me.1991) (emphasis in original). "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient. Anything less than the full measure of disclosure leaves counsel at risk that all compensation may be denied." *Id.* at 517 (citations omitted). The information is to be placed in the form required under Bankruptcy Rule 2016(b); a court is not required to look in the statement of affairs or in other pleadings in the case to determine the relationship between debtor and his or her attorney. *See id.; see also In re Prudhomme*, 43 F.3d 1000, 1003 (5th Cir.1995) (ordering disgorgement where retainer was disclosed in statement of affairs, but not in Rule 2016 statement); *see also In re Smitty's Truck Stop, Inc.*, [210 B.R. 844, 849 (10th Cir.BAP1997) ] (same).[57]

The Court has since extended this ruling to cover all professionals employed by a bankruptcy estate in any capacity.[58] The *Woodward* and *Sabre* cases dealt with incomplete disclosures. Here, we have a slightly different issue: counsel affirmatively stated to the Court that it would be working for one master (Malloy), and then went out and worked for another (Universal).

The Court concludes that, to the extent DSDA was working for Universal from and after September 7, 1999, it was not working in a capacity as an authorized professional under § 327 of the Code, and is not entitled to compensation for services performed for Universal.[59] To the extent that DSDA and Bratton claim they were working for Malloy in the drafting of the Second and Third Amended Plans and disclosure statements, the Court rejects the claim as a matter of fact. The evidence before the Court is that Malloy was not involved in and did not support these efforts at reorganization. It is difficult to understand how an attorney can be working for a client and at cross purposes with that client at the same time on the same task.

Bratton and DSDA argue that the reorganization efforts which they undertook were contemplated in the Compromise and that, as a result, Malloy should not take issue with them. The argument sounds in estoppel.[60] The Court disagrees with the characterization of the Compromise advanced by Bratton and DSDA. Under the

---

57. *In re Woodward*, 229 B.R. 468, 474 (Bankr. N.D.Okla.1999).

58. *In re Sabre Int'l, Inc.*, 289 B.R. 420, 426 (Bankr.N.D.Okla.2003).

59. The Application seeks compensation for services rendered by DSDA in its capacity as counsel for Universal, *not* Malloy.

60. At the hearing on the Application, Bratton stated that he was not contending that Malloy was somehow estopped from contesting the fees, but he maintained his argument that

under the terms of the Compromise, "the Trustee and the [Unsecured Creditors] Committee agreed that it would be in the best interest of the Estate and its Creditors for the Debtor to propose a plan, and supported the retention of DSDA as Special Counsel for such purpose." *Response of DSDA to Objections of Trustee and UST to Application, Docket No. 1132,* ¶ 11, p. 6. After consideration, the Court has difficulty seeing this argument as something other than an estoppel argument.

terms of the Compromise, the Trustee obtained the same results he would have obtained had he prevailed in all of the pending litigation (substantive consolidation of the bankruptcy estates and appointment of a Chapter 11 trustee) in exchange for a relatively short period of time for Universal to pursue reorganization (60 days). While the Compromise certainly provided Universal with the opportunity to file another plan, it was not a blanket endorsement by Malloy of whatever plan Universal might choose to file. While DSDA was employed as special counsel *for Malloy* to file a plan, the order authorizing the employment did not authorize DSDA to file a plan which Malloy did not support and then seek compensation from the bankruptcy estate for those efforts. One can envision a scenario where DSDA, working with Malloy in its capacity as special counsel, drafted a plan and disclosure statement which had Malloy's support. In that situation, compensation may well have been appropriate. Those are not the facts before the Court.

*Denial of All Fees Based Upon the Fraudulent Nature of Universal's Business*

██ Prior to their appointment as special counsel on September 7, 1999, DSDA

and Bratton provided substantial services to the Debtor. These are categorized in the Application as case administration, communications with creditors and creditors committee, plan, securities matters, and business operations.[61] While many of these tasks may provide a benefit in cases where there is a legitimate prospect of reorganization, the same cannot be said when the debtor has no legitimate business enterprise. By way of example, let us consider the preparation and filing of monthly operating reports. The initial report and the monthly operating reports filed by Universal showed virtually no business activity.[62] While the Court does not dispute that the work was done, the Court fails to see its benefit to the estate. This applies equally to the preparation of the initial petition, schedules, and statement of affairs. While such documents are necessary in a case filed under any chapter of the Bankruptcy Code, counsel in this case knew or should have known that reorganization under Chapter 11 was never a viable possibility for Universal. This case "was filed without any reasonable prospect of success or in an effort to head off an inevitable adjudication of bank-

---

61. By way of example, the Application provides the following general description of tasks related to "case administration":

Case Administration. Applicant prepared the Debtor's Petition, Schedules of Assets and Liabilities, Statement of Financial Affairs, creditor lists, initial report, and reviewed and assisted with the preparation of the monthly operating reports. Applicant met with the Assistant United States Trustee and advised Debtor regarding compliance with the U.S. Trustee guidelines; Applicant assisted in establishing bank accounts and work [sic] with the client regarding operations, accounting, Debtor's status as Debtor in possession, and insurance matters; Applicant conducted investigations into related entities and transfers, participated in several status conferences with the Court and the AUST; and handled attorneys and

accountants' retention matters and obtained a bar order in the case. *Application, Docket No. 1110*, ¶ 10.

62. *See, e.g., DSDA Ex. 2*, page 3 (no income in month prior to case filing); *Docket No. 62* (no revenue in months of August, September, and October of 1998); *Docket No. 71* (November 1998—no revenue); *Docket No. 78* (December 1998—no revenue); *Docket No. 105* (January 1999—no revenue); *Docket No. 126* (February 1999—no revenue); *Docket No. 131* (March 1999—$500 in gross revenue). Indeed, based upon the operating reports, this $500.00 was the grand total of all revenue generated by Universal in the time period between its filing and the date of conversion to Chapter 7. This hardly seems a sufficient economic foundation on which to build a reorganization.

ruptcy." [63]  Placement of this Debtor in a Chapter 11 case for the purpose of attempting to reorganize a nonexistent business, while failing to provide creditors with any meaningful information regarding Universal's business for months after the initial filing date, did not benefit the estate. It merely served to delay the inevitable march of Universal toward liquidation in a misguided attempt to keep Eckhart in control.

Malloy and the UST argue that DSDA should be denied all fees because Bratton and DSDA knew, or should have known, that Universal was nothing more than a Ponzi scheme, and reorganization of a Ponzi scheme under Chapter 11 of the Bankruptcy Code is *per se* improper.  If the reorganization effort is improper, the argument continues, then it is equally improper to award fees for services incurred in pursuit of the improper reorganization. There is strong evidence to support the argument that Bratton and DSDA knew the true nature of the Universal beast either prior to or shortly after the bankruptcy case was filed.  It can hardly be disputed that Bratton and DSDA continued in their efforts to reorganize Universal long after they knew that it was little more than a scam operated by Eckhart.  Malloy and the UST contend that an award of fees under these circumstances would reward improper conduct in this case and encourage such conduct in future cases.  DSDA and Bratton argue that there was a viable possibility that Universal could have been reorganized and that such a possibility is enough to justify compensation for the efforts made in that regard.

■ Support for the position advanced by Malloy and the UST is found in *Lederman:*

Finally, R & K argues that the bankruptcy court abused its discretion in denying compensation for the reorganization work, characterizing the court's order as "punishment" for the debtor's decision to file a second proceeding.  R & K was not denied fees as a penalty, however, but because its services were unnecessary.  As the bankruptcy court found, *the debtor's inability to successfully develop and complete a plan should have been apparent to counsel from commencement of the case. Therefore, any work performed by R & K was not necessary, and the bankruptcy court did not abuse its discretion in refusing to compensate the law firm for such services. See, e.g., In re Office Prods. of Am., Inc.,* 136 B.R. 983, 990–91 (Bankr.W.D.Tex. 1992) (if it is clear that debtor and its counsel knew or should have known from the outset that plan could not satisfy requisites of 11 U.S.C. § 1129(a), counsel cannot expect to be compensated for "actual, necessary" services under § 330(a)); *In re Muir Training Technologies, Inc.,* 120 B.R. 154, 162–63 (Bankr.S.D.Cal.1990) (fees disallowed for time expended after it became clear there was no reasonable prospect of reorganization); *Miner v. Westergren, Hauptman, O'Brien, Wolfe & Hadley, P.C. (In re King),* 96 B.R. 206, 208 (W.D.Mo.1989) (fees disallowed because counsel knew or should have known that reorganization was never a viable possibility); *New York Credit Men's Adjustment Bureau, Inc. v. Ballon, Stoll & Itzler (In re Casco Fashions, Inc.),* 490 F.2d 1197, 1204 (2d Cir.1973)

---

**63.**  *In re Casco Fashions, Inc. N.Y. Credit Men's Adjustment Bureau, Inc. v. Ballon, Stoll & Itzler (In re Casco Fashions, Inc.),* 490 F.2d 1197, 1204 (2d Cir.1973).  *See also Miner v.*

*Westergren, Hauptman, O'Brien, Wolfe & Hadley, P.C. (In re King),* 96 B.R. 206 (W.D.Mo. 1989) (and cases cited therein).

(fees will not be awarded "if a court finds that [the] proceeding was filed without any reasonable prospect of success").[64]

It is well established that, in such a situation, the decision of whether to award a fee and, if so, in what amount, is a matter left to the discretion of the bankruptcy court.[65]

Viewed as a reorganization case, with the goal of having Universal emerge as a viable and legitimate business, this Court is convinced that the case was a lost cause at the time (and in all likelihood long before) Universal found its way to the steps of the bankruptcy courthouse. The evidence is overwhelming that Universal was no more than a Ponzi scheme, with no manner of lawful operations. There is strong evidence that Bratton and DSDA knew or should have known this fact from the beginning. The inquiry stops here, under the analysis contained in *Lederman*, and no fees should be awarded. This case as a Chapter 11 reorganization was never of any value to any party.

■ The benefit of this case to creditors is found in the collection efforts of Malloy, many of which were aided by DSDA, and for which DSDA has been properly compensated. The argument that DSDA and Bratton benefitted the estate by bringing the Debtor into the bankruptcy system rings hollow, especially in light of the involuntary petition filed against Universal only the day before. The Court agrees that successful plan confirmation is not a prerequisite for finding that the services of counsel were necessary to the administration of a case.[66] But here, counsel knew or should have known that reorganization was never a viable option for this Debtor. The Court finds that their efforts in that regard were not necessary and did not provide any benefit to the estate. The Court therefore declines to award any fees for tasks performed prior to September 7, 1999, on the basis that they were of no benefit to the estate.

### Conclusion

The Application is denied in its entirety. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

---

64. *Lederman*, 997 F.2d at 1323–24 (emphasis added).

65. *Staiano v. Cain (In re Lan Assocs. XI, L.P.)*, 192 F.3d 109, 122 (3d Cir.1999) ("In employing the fee setting criteria of Section 330(a), the bankruptcy judge is accorded wide discretion.") (citations omitted); *Lederman*, 997 F.2d at 1323 ("Section 330 of the Code gives the bankruptcy court discretion to award a reasonable fee for 'actual, necessary services.' 11 U.S.C. § 330(a)(1).")); *Dunivent v. Schollett*

*(In re Schollett)*, 980 F.2d 639, 644 (10th Cir.1992); *Houlihan Lokey Howard & Zukin Capital v. Unsecured Creditors' Liquidating Trust (In re Commercial Fin. Servs., Inc.)* 298 B.R. 733, 748 (10th Cir.BAP2003); *In re King*, 96 B.R. at 208 ("The bankruptcy court is given wide discretion in determining 'the legality and reasonableness of any proposed [fee] award.'").

66. *See In re City Mattress, Inc.*, 174 B.R. 23 (Bankr.W.D.N.Y.1994).